**BLOUNT BROTHERS CORPORATION,**
Appellant,

v.

**RELIANCE INSURANCE COMPANY,**
Appellee.

No. 23001.

United States Court of Appeals
Fifth Circuit.

Jan. 11, 1967.

Frank H. McFadden, Allen Poppleton, Bradley, Arant, Rose & White, Birmingham, Ala., for appellant.

Robert C. Black, Montgomery, Ala., Edward Gallagher, Washington, D. C., Hill, Hill, Stovall & Carter, Montgomery, Ala., for appellee.

Before TUTTLE, Chief Judge, and THORNBERRY and GOLDBERG, Circuit Judges.

TUTTLE, Chief Judge:

By this appeal, the appellant attacks the failure of the trial court to direct a verdict in its favor, and, in the alternative, the trial court's failure to grant a judgment notwithstanding the verdict, after a jury had found in favor of the appellee. F.R.Civ.P., Rule 50(a) and (b).

There is no dispute as to the background facts leading up to the lawsuit. Appellant further contends that there was no disputed issue that could properly be presented to the jury as to its theory of the case. This is that appellee Insurance Company's principal, the William Dunbar Co., Inc., a painting contractor under contract with appellant, the general contractor, on a nuclear reactor facility being built for the United States Government in Montgomery County, Maryland, had failed to perform certain essential obligations of this contract which warranted termination of the contract by Blount and made the principal, and thus its surety, liable for the damages resulting from such termination.

On April 25, 1963, appellant Blount Brothers Corporation entered into a contract with the United States of America, acting through the General Services Administration, for the construction of a nuclear reactor facility in Montgomery County, Maryland. This facility consisted of a nuclear reactor, located in a concrete containment building, and a supporting laboratory and office wing. On August 2, 1963, Blount entered into a subcontract with the William Dunbar Company, Inc., by the terms of which Dunbar agreed to perform certain portions of the prime contract, specifically, the application of special coatings in the nuclear reactor building and the painting in the laboratory and administrative buildings. The Standard Accident Insurance Company was surety on Dunbar's bond. Standard was later merged with Reliance Insurance Company, which assumed all of the other company's obligations. By November 23, 1964, Blount, purporting to act pursuant to the authority of Art. XIII(a), of the general terms of the contract, notified Dunbar of a termination of the subcontract. Thereupon, Blount found another subcontractor who was engaged to complete the work (a substantial part) not already finished by Dunbar, and filed this suit against the bonding company to recover damages by reason of the fact that the subsequent contract cost substantially more than the unpaid balance due on the original subcontract with Dunbar.

■ The appellant's brief seeks too glibly to pitch the appellant's case on what it contends to be judicial admissions by appellee's counsel that the condition of the bond had been breached; that Mr. James Dunbar, president of the bonding company's principal, had admitted in open court on the trial of the case, that conditions of the bond had been broken; and then, in attempting to assert that there were no substantial issues of fact to be passed on by the jury, appellant in its brief, did not outline the testimony most strongly in favor of its opponent, which, of course, is the approach that must be taken to the evidence by one challenging the right of the court to submit the case to the jury for its consideration. The appellee, on the other hand, too blandly asserts that the trial court did not err in refusing to take the case from the jury, because the jury has decided all these questions. The brief says, "A reargument of these questions before this court would not be justified unless the court wishes to consider the case de novo, which it can hardly afford to do."

As might be expected from the fact that the work related to rooms to be used in connection with the housing of a nuclear reactor, the wall, floor and ceiling coverings, the subject of this contract, were of unusual (called by some "sophisticated") coverings, quite different from ordinary interior house paint. Nevertheless, we must view the case in light of the fact that GSA desired to have this building completed exactly as prescribed in the specifications; Blount Brothers Company undertook to complete it in accordance with the same specifications; and Dunbar assumed the obligation to perform those parts of the job as fell within its contract to furnish the coverings. Of course, as required by the statute, the contractor and all of the subcontractors, including Dunbar, gave a performance bond to guarantee "all the

undertakings, covenants, terms, conditions, and agreements * * *" of their respective contracts.

The state of the briefs, referred to above, has made it necessary for us to read the entire transcript of the evidence and to study the more than one hundred documentary exhibits introduced on the trial in order to test the appellant's contention that through counsel's admission during the trial that Dunbar had not literally complied with each of the requirements of the subcontract, and in light of Mr. James Dunbar's testimony to the same effect, there was no substantial evidence of any fact which, if accepted as true, would legally excuse non-compliance with the written terms of the contract.

The historical facts relating to the status of the affair at the time of the letter of termination dated November 23, 1964, can be fairly simply stated. The subcontract required something unusual in the way of performance. It went much further than requiring that Dunbar cover the walls with a certain specified quality of wall coverings. It required, among other things, that, as to some of the work, the material to be used would have to be approved before application and it required, further, that Dunbar be approved by the manufacturer of the material as a qualified applicator, and that Dunbar also be approved by the GSA, as an approved applicator.[1] These requirements applied to four of the thirteen types of materials that were to be used in satisfaction of the painting and covering subcontract. The types were numbered 1 to 13, but the materials required under categories 1 through 9 were promptly approved. The difficulty arose from the ultimate failure, by Dunbar, at the time of termination, to commence applying item 10 and to obtain approval of the unusual, but somewhat less sophisticated materials required for items 11, 12 and 13, and the approval of the particular materials to be used to satisfy these requirements.

Type 10, as required by the specifications, is an elastomeric decontaminable coating for the interior surfaces of the exterior walls of the reactor area. It required several pages of the specifications adequately to set forth the specifications for type 10. It required 4 other pages to specify the items which Dunbar was required to submit to the government in connection with obtaining approval of a proposed manufacturer of special coating type 10.

Types 11, 12 and 13 are non-elastomeric decontaminable coatings intended for ceilings, walls and metal surfaces in the reactor area. It required four pages of the specifications to set forth the requirements as to these types, and six additional pages to specify the items which Dunbar was required to submit to the government in connection with obtaining approval of a proposed manufacturer of special coatings of types 11, 12 and 13. In the later discussion we are dealing only with types 10 through 13.

1. Section 43 of the Specifications 43–19. Polyester Resin Coatings.
   a. Coatings shall be furnished and applied as specified.
   b. Before polyester resin coatings are delivered or applied, the Contractor shall submit for approval by the Contracting Officer, the following:
   Experience record of the applicator in applying polyester resin coating. The applicator's experience record shall include a minimum of one year's experience in applying polyester resin coatings.
   A certified statement in triplicate by the manufacturer of the coating material stating that the experience record of the applicator is acceptable to the manufacturer. The statement shall include the name and address of the manufacturer.
   Three copies of specifications, descriptive data, and catalogs of the coating system proposed.
   Three sample coupons for each type of surface to be coated. The samples shall be approximately 6 inches by 6 inches, applied to the same type of surface as those to be coated in the work (metal samples for metal surfaces, concrete masonry unit samples, and samples on asbestos-cement board for concrete surfaces).

On February 14, 1964, six months after the contract was signed, Blount wrote to Dunbar requesting strict compliance with these specifications. By a letter of June 6, 1964, General Services Administration criticised Blount for the delay and Blount in turn called this to the attention of Dunbar. In the meantime, Dunbar was submitting samples, together with some of the required supporting data in an effort to meet the specification requirements as to these four types. On June 24, 1964, the General Services Administration reported to Blount and Blount reported to Dunbar with reference to type 10: "Elastomeric coating, Type 10 finish * * * Disapproved in that when individual strips of each were subjected to a flame, they ignited and were not self-extinguishing after strips were removed from the flame." Further examination of elastomeric coating and system was discontinued. In the same letter, type 11 finish was disapproved, type 12 finish was disapproved and type 13 finish was disapproved. The letter then stated:

"All coating samples were manufactured by the Vortex Manufacturing Company of Cleveland, Ohio * * *.

"Other samples for the elastomeric and decontaminable coatings, types 10, 11, 12 and 13 finishes, shall be resubmitted from another manufacturer and source; resubmission shall include all required wet and dry samples, experience record of the applicator, certified statement from the manufacturer of the coating material stating the material experience record of the applicator, certified test data describing the material properties of the components of the proposed coating system, et cetera."

Dunbar was a franchise holder for Vortex products in the area in which this construction took place. The evidence reflects without dispute that the Vortex company was upset and disappointed with the rejection of its products 11, 12 and 13, and insisted upon a resubmission of its products in an effort to have them reconsidered. Notwithstanding the definite injunction, quoted above, that other samples, "shall be resubmitted from another manufacturer and source," no acceptable samples were resubmitted from any other manufacturer or source prior to the termination. Dunbar did, however, resubmit liquid samples of the Vortex types 11, 12 and 13, together with at least partial supporting data as called for. These coatings were not approved by GSA.

Upon the rejection of the Vortex type 10 finish, Dunbar negotiated with the Gates Engineering Company as a manufacturer of type 10. In the meantime, the GSA wrote a letter of July 30th, in which it stated, "The William Dunbar Company, Inc., is approved as applicator for special coatings, types 7, 8, 9, 10, 11, 12 and 13 *provided that another manufacturer of types 10, 11, 12 and 13, whose materials will meet all contract requirements, is submitted for approval of the contracting officer.*" (emphasis added) Thus, at this time, Dunbar had met the test of being approved by GSA as an applicator, provided it submitted materials which could be approved by a manufacturer who would also approve Dunbar.

When Gates was brought into the picture, it analyzed the problem and wrote a long letter embodying instructions for use in connection with its proposed type 10 elastomeric decontaminable coating, in which it criticized the specifications as written, and suggested an alternative method of applying the coating. The Gates representative also stated, "Recent inspection revealed the concrete surfaces generally are not in a condition where they can satisfactorily receive a smooth, continuous, pinhole-free elastomeric coating. Some areas are 'honeycombed' some areas are scratched and gorged, while other areas will definitely require major repairs." Gates therefore suggested "that the only practical solution is to apply a material which will be compatible to the coating system, over the entire concrete area, thus effectively repairing all the various types of surface defects at one time and in one repair system."

In the meantime, however, it appears that Dunbar had made a test sample of the Gates's type 10 on the concrete walls, which was, on November 20, accepted and approved.

Thus affairs stood when, on November 13th, with neither the type 10, the elastomeric decontaminable type, nor types 11, 12, and 13 materials approved,

Blount wrote what may well be considered to be an ultimatum to Dunbar, calling for immediate action with respect to a number of the requirements of the subcontract. As the failure to perform these requested acts constitute the alleged violation of the terms of the subcontract, we shall have to reproduce them fairly fully. This can most conveniently be done in a footnote.[2] It will be noted that

2. The letter, addressed to William Dunbar Company, Inc., and dated November 12th, is as follows:

"On August 2, 1963, we sent you a subcontract covering painting and finishing work for the above reference facility. As of this date, you have failed to submit samples and data acceptable to GSA for Types 11, 12 and 13 coatings and have otherwise failed to prosecute the work in accordance with the requirements of Subcontract Number 7552–27. This has caused delays in the progress of the work.

"It is, therefore, necessary for us to require you to adhere strictly to the following schedule:

(1) Submit, not later than November 23, 1964, the following samples and data for approval by GSA covering special coatings Types 11, 12 and 13.

(a) A general description of the coating system being proposed, and general specifications covering materials and methods of application.

(b) Experience record of the applicator in applying the proposed coating system. The applicator's experience record shall include a minimum of one year's experience in applying the type of coating proposed.

(c) A certified statement by the manufacturer of the coating material stating that the experience record of the applicator is acceptable to the manufacturer. The statement shall include the name and address of the manufacturer.

(d) Certified test data describing the material properties of the components of the proposed coating system as determined by an independent testing laboratory. Data shall cover at least the properties required for chemical resistance and decontaminability.

(e) Two sample coupons for each type of surface to be coated (metal, concrete and concrete masonry units). These samples shall be approximately 6 inches by 6 inches, applied to the same type of surface as those to be coated in the work (metal samples for metal surfaces, concrete or concrete masonry unit samples or asbestos-cement board for concrete or concrete masonry unit surfaces). These samples will be used to evaluate the decontaminability of the proposed system.

(f) Wet samples, one quart each, of the components of the proposed coating system, including thinners and any required activators.

(2) Prepare sample areas as required by specification Paragraph 43–21–c not later than November 23, 1964.

(3) Submit detailed progress and man-hour completion schedules for all remaining work in the job not later than November 23, 1964.

(4) Submit a complete list of materials that go into the job and, also, a complete list of the principal vendors and subcontractors to whom orders have been given not later than November 23, 1964. This list to contain the name, address, purchase order number, items included and delivery dates. Copies of all purchase orders and subcontracts are to be furnished to us as soon as made.

(5) Submit a complete up-to-date procurement schedule, on forms acceptable to us, each month as part of payment application, or when no payment application is made, at the end of the month.

(6) Submit, not later than November 19, 1964, a detailed safety procedure which should contain a procedure for removing dangerous fumes and gases from the various areas during progress of the work. This should include information on the type equipment you will use, etc. and should be approved by your insurance carrier. The safety equipment must be on the job and in operating condition prior to commencement of any coating applications.

(7) Begin, on November 23, 1964, preparation of surfaces which are to receive Types 10, 11, 12 and 13 coatings and upon completion of sufficient areas, to proceed promptly with the application of the coatings in accordance with specifica-

these demands made by Blount on the subcontractor fall in seven categories, as follows: (1) The requirement that there be a submission of the materials needed of the types 11, 12 and 13, as to which Dunbar had failed to submit a satisfactory type. As to these, the record is clear that Dunbar knew suppliers of these types but that it elected not to submit them because they were competitors in the sense that they were applicators as well as manufacturers, and Dunbar considered them his competitors. Instead, on November 23rd, Dunbar submitted to Blount a resubmission, once more, of the Vortex materials which had previously been rejected. There is some dispute as to whether Dunbar also submitted the supporting data listed in the footnote under subheadings (a) through (f). However, we think this unimportant in that the resubmission of Vortex was not in any measure in compliance with the requirement to submit types 11, 12 and 13 for approval. (2) The preparation of sample areas for approval by the GSA. This was to be done not later than November 23rd. The sample area for type 10 was actually approved on November 20th. This left types 11, 12 and 13, which Dunbar said it could not complete because it had not yet found the supplier for these types, a matter wholly within its control and as to which it had made no progress by November 23rd, as mentioned under (1) above. (3) A detailed progress and man-hour completion schedule, to be submitted not later than November 23rd. This was not attempted by Dunbar. Dunbar's president explained on the trial that he did not do this because he had not received from the general contractor any schedule of the completion of its part of the contract or the work of other subcontractors. (4) The submission of a complete list of materials to go into the job together with a list of the vendors and subcontractors not later than November 23rd. This was not done, and Dunbar claimed that it was unable to do it because it did not yet know who would be the suppliers and therefore did not know what materials would go in to the job. This is subject to the same criticism as (1) and (2) above, in that Dunbar had had ample time to submit the names of acceptable suppliers, but had failed to do so, but chose instead to submit for the second or third time the Vortex line, as to which Dunbar was a franchise distributor. (5) The submission of a complete, up-to-date procurement schedule. Dunbar did not do this, claiming it couldn't do it because it didn't know whom it was to procure the materials from. See (4) above. (6) The submission, not later that November 19th, of a detailed safety procedure. This involved listing the manner in which the particular safety precautions

tion requirements. Unless we advise you otherwise in writing, the sequence and timing of your work must be:

    (a) Reactor area basement and mezzanine surfaces as required by contract plans and specifications—start acid etching and surface preparation November 23, 1964 and complete application of all coatings not later than December 4, 1964.

    (b) Reactor area second floor surfaces as required by contract plans and specifications—start acid etching and surface preparation November 26, 1964 and complete application of all coatings not later than December 18, 1964.

    (c) Reactor area first floor surfaces as required by contract plans and specifications—start acid etching and surface preparation November 30, 1964 and complete application of all coatings not later than December 24, 1964.

    (d) Schedule for other areas will be furnished to you by our project superintendent.

"The above submittals should be sent to our office at the job site and should be properly marked and identified as required by the contract specifications.

"You are hereby notified that your failure (without our written consent) to comply strictly with the above listed requirements and other requirements of our subcontract with you will definitely result in termination of the subcontract in accordance with Article XIII thereof. This action will be absolutely necessary to avoid experiencing additional delays. As we have already pointed out, various delays have been experienced to date, and we intend to hold you liable for any direct or indirect expenses, further delays, or damages which have resulted or may result from these delays."

would be taken on account of the inflammable and volatile nature of the materials to be applied. This was not done and, in fact, after the purported termination, Dunbar had a crew of men applying the type 10 coverings without having complied with the safety requirements as provided for in the Gates Company's instructions touching this matter. (7) The beginning, on November 23rd, of preparations of surfaces which are to receive types 10, 11, 12 and 13 coatings, and, upon completion of sufficient areas to proceed promptly with the application of the coatings according to a time schedule as to the different areas involved. These required completion of the several areas on December 4th, December 18th, and December 24th, respectively. None of this, of course, was done because the termination date occurred on the 23rd, although on the 25th Dunbar had on the site some 30 or 35 gallons of type 10 coatings which his foreman was proceeding to apply to the concrete walls of the reactor area.

Relations between the parties severely deteriorated following the submission by Dunbar of the Gates suggestion that an alternative method be used to apply the type 10 coverings. However, the appellee does not seriously contest the legal right of Blount to insist upon prompt compliance with the requirements of the subcontract that had not by November 12th been carried out. Dunbar's defense is, rather, that its compliance was excused either because the surfaces were not ready for its work, or that final compliance was required in too short a time.

There can be no serious dispute between the parties as to the standard by which an appellate court must review the refusal of a trial court to grant a motion for a judgment notwithstanding a verdict by a trial jury, or the denial by a trial court of a motion for new trial. The basic guarantees of the Seventh Amendment to the Constitution of the United States are that "the right of trial by jury shall be preserved, and no facts tried by a jury, shall be otherwise re-examined in any court of the United States, than according to the rules of the common law." It goes without saying that under this constitutional prohibition, neither the trial courts nor appellate courts in the federal system are permitted to reweigh the evidence. In what the appellee calls "probably the best statement of the applicable rule," the United States Supreme Court, in Lavender v. Kurn, has said where "[T]here is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion." 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916. Correlatively, if there is not evidentiary basis for the jury's verdict, then the verdict can not be permitted to stand. See Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458. In the case of Lake County, for Use and Benefit of Baxley v. Massachusetts Bonding Ins. Co., 5 Cir., 75 F.2d 6, this court said: "We have undertaken in many cases, as other courts have, to make it clear that a District Judge may not direct a verdict against a party because he does not credit his evidence, and would, on that account, be disposed to set aside the verdict in his favor. He may only direct a verdict against a party when he can say that, viewing [the evidence] in a light most favorable to that party, fair-minded men cannot honestly and reasonably draw a conclusion from it in his favor [citing cases]." 75 F.2d 6, 8.

This general language does not help us because, of course, the question in every case in whether there is any evidence which, together with all of the permissible inferences to be drawn from it, permits a finding by the jury as to the precise issues which it is the duty of court and jury to resolve.

Here, the appellant overstresses its argument that there were judicial admissions by appellee's counsel during the trial that there had been several *breaches* in the contract; further, that James Dunbar, president of the Dunbar Company, in his oral testimony, also admit-

ted such breaches. The trouble with this argument is that no such admission by counsel or testimony by the witnesses was given in precisely that manner. The argument of counsel and the testimony of Mr. Dunbar was in effect an admission that certain things that were called for by the contract had not been done, but they attempted to excuse the failure of performance in what at common law pleading used to be called confession and avoidance. Thus, it becomes necessary for the court to examine the excuses given for the failure to carry out the exact terms of the contract. If, upon application of the proper legal principles, there was evidence which would have amounted to a defense against performing the requirements, this court could not review the jury's resolution of such factual issues. On the other hand, if there were substantial failures to perform, as was admitted, and there were no facts presented to the jury which, under the law, would excuse performance, then the jury verdict should have been set aside on the motion, and the judgment should be reversed by us.

We conclude from a careful reading of the record, that as to several of the failures of the Dunbar Company, there were no issues of fact, which, if resolved in favor of Dunbar would excuse such failure. We conclude, therefore, that as to the issue of breach of the contract, the verdict should have been directed by the trial court.

Appellee defends largely upon the concept that its bonded contractor had undertaken a very difficult subcontract which it was attempting, to the best of its ability, to carry out at the time of termination. A second defense is that at the time of termination others were at fault for the failure of Dunbar and Company to satisfy the requirements imposed on it by the subcontract.

With respect to the first defense, appellee's brief says:

"The fact is, and the record shows, it was Dunbar's contention throughout the proceeding (and the argument of counsel for appellee) that he did every-thing possible to obtain approval, exercised due diligence in doing so, and that the fault, and the force of the difficulty encountered in securing the approval of certain coatings, *lay in the specifications designed by the government*. This is what the record shows, and this is what the comment of counsel say." (Emphasis added.)

It is difficult to see how the fact that Dunbar's difficulty arose from the specifications designed by the government could be any defense to Dunbar's failure. These were the specifications which the subcontractor agreed to be bound by. Moreover, the record is absolutely without dispute that it would have been extremely simple for Dunbar to have obtained approval of types 11, 12 and 13, if this subcontractor had been willing to approach sources of supply, the names of whom were furnished to Dunbar by Blount early in the period of the contract. Instead of this, Dunbar, entirely possibly because it had an interest in selling Vortex paint and coverings, twice resubmitted this product after it had been rejected by the General Services Administration.

As to type 10, the most sophisticated type of covering involved, the record shows that after the ultimatum letter was written, Dunbar received approval of its sample of type 10 covering; it had by that time obtained approval as an applicator of this type 10 covering, and this further demonstrated, without dispute, that the surfaces provided for the making of the sample were fully adequate and appropriate. Thus there is absolutely no proof in the record to show why Dunbar could not have proceeded with the application of type 10, commencing on November 23rd, as required by the Blount communication of November 13th, unless it be the condition of the surfaces on which type 10 coverings were to be applied, *a matter which we will later deal with.*

The absolute failure of Dunbar to furnish any of the schedules or any of the lists of materials and names of suppliers of types 10, 11, 12 and 13, "before No-

vember 23rd," as required in Blount's letter, cannot be excused by any testimony given on the trial, for, as above indicated, there was no proof that there was any bar to Dunbar's ascertainment of the names and qualifications of the suppliers of these types of coverings prior to that date.

Next, with respect to appellee's contention that performance of these provisions of the contract was excused by the generalized statements of some of the witnesses at the trial that parts of the walls were damp on November 13th, and some parts were still unsuitable on November 23rd, we conclude that this matter was taken out of the realm of a jury issue by reason of the actions of the subcontractor on November 25th. On that date, the foreman and several assistants showed up at the job site with some 30 to 35 gallons of wall coverings of the type 10 and started to apply it. They continued for some time in doing so, as a demonstration, so they said, of their ability to carry out the terms of the contract. This belies any effort to show that the condition of the surfaces at that time was such that Dunbar was prevented during the period mentioned in the November 13th letter, from carrying out this phase of its contract.

Moreover, the terms of the subcontract required that Dunbar and Company assume some of the responsibilities for "preparation of surfaces." Under the section of the general contract, denominated "Painting and Finishing," which is also the title of the subcontract under which Dunbar was operating, it was arguably the responsibility of Dunbar to correct the defects in the surfaces that, on the trial, its witnesses undertook to show existed at the time of the receipt of the November 13th letter. However, whichever party had this responsibility, the issue did not remain in the case because of the fact that within the period specified under the contract, Dunbar started the work on type 10 covering, which is the only type of surface whose imperfect condition it contended would in any way delay its full perform-

ance of the requirements as laid down by Blount.

Moreover, as has been indicated above, even if there had been delays in the actual performance of the application of the coverings by reason of defects in the surfaces, this had no bearing upon the failure by Dunbar to comply with the other requirements as to scheduling of the work so far as such schedules could remain within its own control, obtaining the government's approval of the remaining types of coverings and the submission of detailed statements concerning the names of suppliers and the names of the products to be used. In light of Blount's difficulty in having the type 10 coverings approved, and in light of the repeated submissions of the disapproved product by Vortex, Blount's concern some five months before it was required to complete construction that this information be furnished was not only reasonable, it was essential to prevent it from being subject to a termination of the contract by the principal, the General Services Administration.

In sum, the record discloses no dispute about the following facts: Some 13 or 14 months after the subcontract had been entered into, and within five months of the date of termination, Dunbar had completely failed to submit and obtain approval of three out of the four most unusual types of coverings that had to be used to complete the job; Dunbar had not prepared sample areas for approval as to types 11, 12 and 13; Dunbar had failed to submit a detailed progress and man-hour completion schedule because of its failure to obtain from the general contractor any schedule of the completion of its part of the contract; Dunbar had failed to submit a complete list of materials to go into the job, together with a list of the vendors or subcontractors because of its failure to obtain approval of the materials and thus of the suppliers; Dunbar had failed to submit an up-to-date procurement schedule which, of course, it said it could not do because it did not even know yet what materials it was to procure; there had

been a complete failure by Dunbar to submit a safety procedure.

None of these failures could be excused by the fact that there were defects in the surfaces on which Dunbar was to apply the type 10 covering, because whatever defects there were were either unimportant [3] or had been overcome by the method of application. There is nothing in the record that indicates any reason why it would be impossible for Dunbar to complete the schedule of application of type 10 within the time specified in the November 13th letter. If, however, defects in the surfaces were apparent during this period of time, the general terms of the contract provided means by which this dispute could be resolved. Certainly their prior existence and the possibility of there still being some surface defects, even if none of this fell to the lot of the subcontractor to repair them, did not justify the failure of the subcontractor to carry out the remaining terms of the contract dealing with the types 11, 12 and 13 coverings, all of which were no further advanced than they had been the day the contract was signed, other than the fact that the government had expressly ruled out the only proposed materials submitted by Dunbar.

We find no evidence to warrant submission of the excuses for non-performance to the jury, because none of this evidence was sufficient as a defense to the requirements of the general terms of the contract and the specific terms of the subcontract.

We conclude that the judgment of the trial court refusing the motion for judgment non obstante veredicto must be reversed and the case remanded for determination of the amount of damages resulting from the breaches of the subcontract for which the appellee bonding company made itself liable.

The judgment is reversed.

3. It appears that Dunbar furnished two sample coatings at places designated for this type 10 covering; the first was applied by rollers and it appeared defective, whereupon Dunbar prepared a sec-

ond test area by a hot-spray method, and this was fully approved by the General Services Administration, and thus such defects as had existed seem to have been fully overcome prior to November 23rd.