**Arthur JACKSON, Plaintiff-Appellee,**

v.

**W.I. HOLLOWELL, et al.,
Defendants-Appellants.**

No. 82–4138.

United States Court of Appeals,
Fifth Circuit.

Sept. 22, 1983.

Rehearing Denied Nov. 10, 1983.

Robert L. Gibbs, Sp. Asst. Atty. Gen., P. Roger Googe, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants-appellants.

James L. Robertson, Oxford, Miss., for New Hampshire Ins. Co., Granite Ins. Co., and USF&G.

Jerome C. Hafter, Greenville, Miss., Whitman B. Johnson, III, Jackson, Miss., for Western Sur. Co.

Robert E. Buck, Greenville, Miss., for plaintiff-appellee.

* District Judge of the District of Massachusetts, sitting by designation.

1. Established in 1903, Parchman is the sole state prison for the State of Mississippi. Parchman is located in the Delta region of the state and always has been operated essentially as a cotton farm.

2. Under the classification system utilized at Parchman at the time of the incident, certain inmates were classified as "trusty shooters." These inmates were armed with loaded shotguns and were entrusted with the responsibility of guarding the other inmates.

3. 42 U.S.C. § 1983 provides:

Before REAVLEY and JOHNSON, Circuit Judges, and WYZANSKI *, District Judge.

JOHNSON, Circuit Judge:

On February 6, 1973, Arthur Jackson, an eighteen-year old inmate in the Mississippi State Prison (Parchman),[1] lost his left eye as a result of a ricochet bullet fired from a sawed-off shotgun by Lepoleon Reed, an armed trusty shooter.[2] Jackson instituted this action pursuant to 42 U.S.C. § 1983 [3] alleging that various Parchman officials and employees violated his clearly established constitutional right to be free from cruel and unusual punishment in the form of trusty shooters who were inadequately screened for mental, emotional, or other problems. Initially, the district court granted a summary judgment favorable to all defendants on the basis of qualified immunity, but this court, in a prior panel opinion, *Jackson v. State of Mississippi,* 644 F.2d 1142 (5th Cir.1981) (hereinafter *Jackson I*), held that the defendants were not entitled to summary judgment on the basis of qualified immunity, since Jackson's constitutional right to be free from cruel and unusual punishment in the form of inadequately screened trusty shooters had been clearly established in *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss.1972), *aff'd,* 501 F.2d 1291 (5th Cir.1974) (hereinafter *Gates*), a

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

case that revealed numerous egregious unconstitutional conditions at Parchman. Upon remand, the case was tried to a jury and Jackson was awarded $50,000 in compensatory damages for the loss of his eye. The district court rendered a judgment on the jury's verdict against all eight defendants, jointly and severally, and this Court affirms.

## I. Background

In order to fully appreciate the facts of this case, one must briefly retrace the lengthy history of litigation concerning the conditions at Parchman.

### A. Gates v. Collier: Clearly Established Law Unfolds

In *Gates,* a class action brought by and on behalf of Parchman inmates, it was demonstrated that various officials in the Mississippi State Prison System had maintained a system of prison facilities violative of prisoner rights secured by the first, eighth, thirteenth, and fourteenth amendments.[4] The district court ordered broad sweeping immediate, intermediate, and long range relief.[5]

With regard to the use of trusty shooters, the district court found that the trusty shooters were selected by prison officials without the use of objective criteria or uniform standards and that payoffs, favoritism, extortion, and participation in illegal activities had infected the selection process. Disturbingly, the district court noted:

Penitentiary records indicate that many of the armed trusties have been convicted of violent crimes, and that of the armed trusties serving as of April 1, 1971, 35% had not been psychologically tested, 40% of those tested were found to be retarded, and 71% of those tested were found to have personality disorders. There is no formal program at Parchman for training trusties and they are instructed to maintain discipline by shooting at inmates who get out of the gun line; in many cases, trusties have received little training in the handling of firearms. Inmates have, on many occasions, suffered injuries and abuses as a result of the failure to select, train, supervise and maintain an adequate custodial staff. Trusties have abused their position to engage in loan-sharking, extortion and other illegal conduct in dealing with inmates subject to their authority and control. The evidence indicates that the use of trusties who exercise authority over fellow inmates has established intolerable patterns of physical mistreatment. For example, during the

---

**4.** The plaintiffs in *Gates* had little difficulty proving that the conditions and practices at Parchman violated these constitutional guarantees. Indeed, the Governor of Mississippi forthrightly admitted the existence of constitutional violations in the Parchman operations: "We are, in effect, Your Honor, admitting that the constitutional provisions have been violated." *The Governor asked the court:* "Isn't there enough of the incriminating facts in these depositions and interrogatories to give the Court adequate grounds to find a conclusion of fact that the First Amendment and all other constitutional provisions have been violated ...?" *Gates,* 501 F.2d at 1295.

**5.** In *Gates,* this Court summarized the district court's order in the following manner:

The (A) immediate and intermediate relief was directed towards (1) the elimination of unconstitutional censorship of prisoner mail; (2) the establishment of definite and constitutionally permissive rules and regulations regarding inmate discipline; (3) the prohibition of any form of corporal punishment of such severity as to offend present day concepts of human dignity; (4) the ban against use of disciplinary segregation or isolation at the Maximum Security Unit except under conditions which would satisfy the requirements of the cruel and unusual punishment clause; (5) the improvement of medical facilities and staff; (6) the institution of reasonable procedures to protect inmates from assault by fellow inmates; (7) the abolition of the trusty system insofar as it utilizes trusties in custodial positions; (8) and certain renovations in the physical facilities involving health hazards at Parchman.

Regarding the (B) long-range relief, the court ordered the defendants to submit "a comprehensive plan for the elimination of all unconstitutional conditions in inmate housing, inadequate inmate housing, inadequate water, sewer and utilities, inadequate fire fighting equipment, inadequate hospital and other structures condemned by this court." *Gates,* 501 F.2d at 1296.

Cook administration, 30 inmates received gunshot wounds, an additional 29 inmates were shot at, and 52 inmates physically beaten.

*Gates,* 349 F.Supp. at 889.

Understandably, the district court, on October 20, 1972, ordered Parchman officials, including the then active members of the Mississippi Penitentiary Board and the Superintendent, to replace all trusty shooters with civilian guards by June 20, 1973. In the interim period, the district court ordered the defendants to "ensure, by a careful review of inmate personnel records and psychological tests, that inmates placed in a position of supervision or custody of other inmates are mentally and emotionally fit to perform their assigned tasks." *Gates,* 349 F.Supp. at 903.

On direct appeal, this Court affirmed the district court's order and stated:

> We have no difficulty in reaching the conclusion that this trusty system, which utilizes unscreened inmates violates state law, and which allows inmates to exercise unchecked authority over other inmates, constitutes cruel and unusual punishment in violation of the Eighth Amendment, warranting the district court's prohibition of certain portions of the trusty system. . . .

*Gates,* 501 F.2d at 1308. Finally, in the prior appeal of the case *sub judice,* this Court resolved any doubt as to the constitutional infirmity of Parchman's utilization of inadequately screened trusty shooters and held: "We hold that the *Gates* order clearly established Jackson's constitutional right to be free from cruel and unusual punishment in the form of trusty shooters who were inadequately screened for mental, emotional, or other problems." *Jackson I,* 644 F.2d at 1146.

### B. Facts

The facts leading up to Jackson's loss of his left eye were ably presented in *Jackson I* and we quote therefrom.

In October 1972, Arthur Jackson began serving at Parchman a five-year prison term for armed robbery. On February 6, 1973, Jackson and other prisoners were boarding a bus to be transported to a vocational school at the penitentiary. As was the practice at that time, another prisoner designated as a "trusty shooter" was guarding these inmates with a shotgun. Noticing that some inmates were pushing to the front of the line to get a seat on the bus, the trusty shooter fired a warning shot. One of the pellets from this 00 buckshot load penetrated Jackson's left eyeball.[6] Jackson was taken to the prison's medical facilities where the doctor on duty cleaned and dressed the wound. The doctor called the University Hospital in Jackson, Mississippi, for advice and was told to have Jackson transported to that hospital. He did so. The drive took approximately three hours. At the University Hospital, Jackson's eye was surgically removed.

*Jackson I,* 644 F.2d at 1143, 1144.

### II. *Merits*

All defendants-appellants claim that the district court erred by refusing to accord them the protection of the doctrine of qualified immunity. Appellants also maintain that Jackson failed to demonstrate that each of the defendants' conduct violated Jackson's clearly established constitutional right and that the district court erred by allowing Jackson's counsel to read to the jury findings of facts made by the district court in *Gates.* We address each issue *seriatim.*

### A. *Qualified Immunity*

■ Longstanding precedent establishes the appellants' entitlement to the benefit of the qualified immunity defense previously recognized in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and specifically made applicable to prison officials in *Procunier v. Navarete,* 434 U.S. 555,

---

**6.** Parchman officials had ordered discontinuance of the use of 00 buckshot prior to the incident. Nevertheless, it remains undisputed that Jackson's eye was pierced by a pellet of 00 buckshot.

98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Recent precedent demonstrates, however, that the qualified immunity defense no longer requires an objective and subjective inquiry. In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* 102 S.Ct. at 2738. Noting that the costs attending litigation of subjective good faith are "peculiarly disruptive of effective government," the Supreme Court eliminated the second prong of the immunity defense and held that the good faith of government officials is now to be tested only by objective criteria. *Id.* 102 S.Ct. at 2738; *see also Trejo v. Perez,* 693 F.2d 482, 484–85 (5th Cir.1982); and *Brewer v. Blackwell,* 692 F.2d 387 (5th Cir.1982). Although the Supreme Court has refused to require government officials to predict the developing nuances of constitutional law, the Court has recognized that "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald,* 102 S.Ct. at 2738.

We have little difficulty concluding that the objective factors demonstrate that the constitutional right allegedly infringed by the defendants was clearly established at the time of their challenged conduct and that they knew of this clearly established constitutional guarantee. None of the defendants-appellants seriously contend that Jackson's right to be free from inadequately screened trusty shooters was not clearly established at the time of the alleged constitutional violation. Nor could they so contend. *Gates* specifically held that Parchman's use of inadequately screened trusty shooters constituted cruel and unusual punishment necessitating immediate judicial intervention and broad sweeping reform. *Gates* directed immediate relief during the interim period with its order that the de-

fendants "ensure, by a careful review of inmate personnel records and psychological tests, that inmates placed in a position of supervision or custody of other inmates are mentally and emotionally fit to perform their assigned tasks." Moreover, this Court expressly held in the first appeal of this case (*Jackson I*) that the *Gates* order clearly established Jackson's constitutional right to be free from inadequately screened trusty shooters. Thus, we find Jackson's right to be free from inadequately screened trusty shooters clearly established at the time of the incident.

We need not determine whether the appellants *should have known* of Jackson's clearly established constitutional right since the appellants concede that they were thoroughly familiar with the *Gates* decision and actually knew of the clearly established constitutional law governing their conduct. It must be remembered that the defendants in *Gates,* the then-active members of the Mississippi Penitentiary Board, the Superintendent, and the Governor of the State, all named in their official capacity, were placed on notice of the numerous constitutional infirmities at Parchman and were ordered to implement extensive immediate, intermediate, and long-range reforms. The record clearly reveals that each defendant was thoroughly aware of the decision in *Gates* and was involved in frequent daily discussion of the decision. The following excerpt from the testimony of Superintendent Hollowell exemplifies the extensive contact the members of the Mississippi Penitentiary Board, the Superintendent, the Assistant Superintendents, and the other prison employees had with the day-to-day implementation of the relief ordered in *Gates.*

Q. I take it, however, that you were aware of the Court's decision in *Gates v. Collier?*

A. I was.

Q. At the time that it was handed down?

A. I was.

Q. And you certainly became more familiar with it at the time you received your appointment?

A. That is right.

Q. In fact, you did have occasion to read it, did you not, sir?

A. I did.

Q. And study it?

A. Right.

Q. Did you have occasion shortly after you became acting superintendent to discuss the *Gates* case with the Attorney General's Office?

A. On practically a daily basis.

Q. Did you have occasion to discuss it with members of the board?

A. I did.

Q. And I take it this case was discussed rather extensively at the board meetings?

A. Until all of those points of the *Gates v. Collier* [order] were implemented.

Q. What month was the first board meeting held that you attended as acting superintendent?

A. I don't remember the exact date. We had—the chairman of the board was up there on a daily basis. I don't even know the exact date that the board met. I don't know whether it was the first or the second Monday of each month.

Q. Of course, the board meets once each month on a regular basis?

A. Right.

Q. But during this period of time there were board members there, as you indicated?

A. On a daily basis.

Q. Daily basis.

Now, did you have any assistants working under your supervision?

A. Had two.

Q. And who were they?

A. Mr. Cash and Clifford Jennings.

Record, vol. II at 45–47.

In sum, it is abundantly clear that Jackson's constitutional right to be free from inadequately screened trusty shooters was clearly established and that the defendants were aware, individually and jointly, of this constitutional guarantee. Hence, we affirm the district court's refusal to accord the defendants the protections of qualified immunity. This, however, does not establish each individual defendant's liability to Jackson. Although the defendants have failed to demonstrate their entitlement to the protections of qualified immunity, a separate inquiry must be made to determine whether Jackson adequately demonstrated that his clearly established constitutional right was violated by each defendant and that each defendant's conduct was a proximate cause of his injury. *See Williams v. Treen,* 671 F.2d 892, 900 n. 15 (5th Cir.1982) ("Of course, while the defendant officials are not entitled to an immunity, we do not mean to suggest that upon remand, the defendants must be found liable. In this case, there is a host of defendants .... In order to establish the personal liability of a given defendant, the plaintiff must show that a particular official's action (or inaction) caused a violation of plaintiff's rights."); and *Sims v. Adams,* 537 F.2d 829 (5th Cir.1976).

**B.** *The Defendants' Liability*

Jackson's complaint names various prison officials as defendants. Specifically, named as defendants in their official capacities are: W.I. Hollowell, former acting Parchman superintendent, Liberty Cash, Jr., and Clifford F. Jennings, Hollowell's assistant superintendents, and the five members of the Mississippi Penitentiary Board at the time of the incident. While several of the defendants are situated similarly, we address each defendant's liability separately in light of the entire record.[7] *See Williams v. Treen,* 671 F.2d at 900 n. 15.

---

**7.** Although the defendants-appellants criticize the district court for lumping the defendants together on the issue of liability, we note that the defendants were given the opportunity to object to the court's charge, but instead remained silent and allowed the court to submit the issue concerning the defendants' liability in a single issue.

### 1. *Superintendent Hollowell*

■ Defendant Hollowell was appointed acting superintendent on December 8, 1972 by the five members of the Mississippi Penitentiary Board. Hollowell's duties under state law were set forth in 1964 Miss.Laws, ch. 378, § 10 which provided:

A superintendent ... shall be vested with the exclusive management and control of the prison system, and all properties belonging thereto, subject only to the limitations of this act, *and shall be responsible for the management of the affairs of the prison system and for the proper care, treatment, feeding, clothing and management of the prisoners confined therein.* A superintendent shall have sole authority to employ and discharge employees.

(emphasis added). Along with his duties under state law, of course, Superintendent Hollowell also was responsible for implementing the orders set forth in *Gates.* As noted previously, the superintendent and members of the prison board were named in their official capacities in the *Gates* decision. The broad relief ordered by the district court in *Gates,* affirmed on appeal by this Court, required all of the defendants, including the superintendent and members of the Mississippi Penitentiary Board immediately to initiate and implement the district court's order, which included the requirement of effective and careful review of the trusty shooters' files. Although Hollowell was not the superintendent at Parchman at the time of the *Gates* order, he concedes that he was intimately familiar with the *Gates* order and the responsibilities it placed upon him as the newly appointed superintendent.[8] We conclude, therefore, that Superintendent Hollowell had a duty under state law and clearly established constitutional law to ensure that the prisoners at Parchman were protected from trusty shooters who were inadequately screened for mental, emotional, or other problems.

We also find sufficient evidence to uphold the jury's finding that Superintendent Hollowell breached his duty and proximately caused Jackson's injuries. As noted previously, this Court, in *Jackson I,* expressly held that the "*Gates* order clearly established Jackson's constitutional right to be free from cruel and unusual punishment in the form of trusty shooters who were inadequately screened for mental, emotional, or other problems." 644 F.2d at 1146. Relying upon this Court's express holding, the district court, in the trial of this case, instructed the jury to find for the plaintiff if they were convinced by a preponderance of the evidence that the defendants failed to comply with the *Gates* order by not carefully reviewing the trusty shooters' records, and that that failure proximately caused the plaintiff's injuries. 2d Supp. Record, at 12–16. The jury concluded that Superintendent Hollowell's conduct violated the *Gates* order and proximately caused Jackson's injuries. A review of the record demonstrates that reasonable and impartial minds could reach the conclusion expressed in the jury's verdict. *See Fielder v. Bosshard,* 590 F.2d 105 (5th Cir.1979); *Blount Brothers Co. v. Reliance Insurance Co.,* 370 F.2d 733 (5th Cir.1967), *cert. denied,* 387 U.S. 907, 87 S.Ct. 1689, 18 L.Ed.2d 627 (1967).

The evidence demonstrated that Superintendent Hollowell had been on duty approximately sixty days when trusty shooter Lepoleon Reed discharged the ricochet bullet that blinded Jackson. Although the evidence further demonstrates that a review of the trusty shooters' files had *allegedly* been initiated, nothing in the record indicates that Lepoleon Reed's file had been reviewed or, indeed, that any trusty shooters' files had been reviewed. In fact, the

---

**8.** Any doubt as to Superintendent Hollowell's responsibilities under the *Gates* order was removed in this Court's opinion in *Gates.* This Court stated: "That the individuals now holding these offices may not be the same as those in office when this suit was commenced is immaterial ... since the defendants were sued in their official [capacities] ... and it is only in their official capacities that they are constrained by the district court's order to act." *Gates,* 501 F.2d at 1321. Like the defendants in *Gates,* the defendants in the case *sub judice* were sued in their official capacities.

record indicates that Lepoleon Reed was allowed to keep his shotgun and trusty shooter status even after he had blinded Jackson. Record, vol. II at 75. Moreover, the defendants were able to specifically identify only one trusty shooter who had been removed from trusty shooter status. Unfortunately, even that trusty shooter was not removed from trusty shooter status as a result of the defendants' screening of his file. Instead, the trusty shooter was removed from trusty shooter status only after he "blew an inmate away." The following testimony was presented to the jury:

Q. [T]ell me this. Tell me one inmate, one trust[y] guard whose status was changed as a result of your review.

A. One?

Q. One.

A. Deadman Johnson.

Q. Who?

A. Deadman Johnson.

Q. Who is Deadman Johnson?

A. Inmate.

Q. Is Deadman his name?

A. Deadman Johnson.

Q. Did you change his status?

A. Right.

THE COURT:

Q. Which way? Up or down?

A. We took the gun away from him.

MR. BUCK:

Q. When did you take the gun away from Deadman?

A. I don't have any idea. I don't remember the date, but it was during that period of time, yes, sir.

Q. Why did you take his gun?

A. Because he blew an inmate away.

Q. I see. This was after the court's order?

A. I can't answer that question.

Q. Well, you said it was during this period of time.

A. We took the gun away from him. I can't give you specific times and dates on it. I just know that we took the gun away from him.

Q. That was a pretty good reason to take the gun away.

A. Yeah, I would say so.

Record, vol. III at 185–85.

Further, the record demonstrates that the plaintiff's attorney diligently attempted to obtain production of any documents demonstrating that a thorough investigation and examination of the trusty shooters' files was undertaken by the defendants. As noted, the defendants all referred to the review process in very vague terms and were unable to point to any concrete evidence demonstrating that an adequate review had been undertaken of any of the files, much less Reed's file specifically. The jury certainly could have concluded that Superintendent Hollowell failed to adequately implement and undertake the review of trusty shooters mandated in *Gates* in light of the plaintiff's demonstration that the officials at Parchman, including Superintendent Hollowell, had failed to establish any formal guidelines or procedures for the examination of trusty shooters. Indeed, Superintendent Hollowell was unable to pinpoint the date on which a review of the files began, the files that had been reviewed, or the guidelines that were used in reviewing the files. This same lack of meaningful objective criteria in the selection of trusty shooters contributed to this Court's original intervention in the trusty shooter system at Parchman. *See Gates*, 501 F.2d at 1307, 1308 ("[T]he trusties at Parchman were selected . . . without the use of objective criteria or uniform standards . . . ."). Hence, we affirm the jury's finding that Superintendent Hollowell violated his duty to ensure that Jackson was protected from inadequately screened trusty shooters.

Superintendent Hollowell further contends that, even if he breached his constitutional duty, his conduct was not a proximate cause of Jackson's injury. According to the defendants, Reed would not have been removed from trusty shooter status had his file been reviewed. Indeed, Reed was allowed to continue as an armed trusty shooter even after he had shot Jackson. However, a review of the record reveals

that Reed clearly was unfit for trusty shooter status and should have been removed from that position.

Lepoleon Reed was incarcerated in Parchman pursuant to two counts of armed robbery. In March 1968, Reed was examined by a psychologist who concluded that "the inmate is functioning at a fullscale IQ of 77, placing him on the borderline average retardate level." This same psychologist concluded: "It almost approaches a criminal act that a young man such as this has been allowed to have such unsupervised freedom, particularly during the formative years of his moral development. It is little wonder that he has not participated in many more antisocial acts. Life has dealt him such a blow that it would be expected, almost as normal, that he would fight back." This psychological profile already was contained within Reed's prison file and was readily accessible to prison officials without the need for further psychological testing. Reed's file also indicates that a warrant for revocation of Reed's parole was issued in 1974 since Reed had been convicted of assault with intent to rob in a state court in Mobile, Alabama and that in 1967 Reed was charged in state court with a crime against nature.

All of this evidence, presented to and considered by the jury, demonstrates that Reed possessed many of the attributes causing this Court to condemn Mississippi's use of trusty shooters in *Gates.* For example, this Court noted in *Gates* that "penitentiary records indicate that many of the armed trusties have been convicted of violent crimes, and that of the armed trusties serving as of April 1, 1971, 35 percent had not been psychologically tested, 40 percent of those tested were found to be retarded, and 71 percent of those tested were found to have personality disorders." We "commit our trust to the jurors who saw and heard the witnesses" and refuse to disturb the jury's finding of liability on the part of

Superintendent Hollowell. *See Fielder v. Bosshard,* 590 F.2d at 109. The evidence adequately demonstrates that Superintendent Hollowell's conduct violated Jackson's clearly established constitutional right and proximately caused Jackson's injury.

2. *Assistant Superintendents Cash and Jennings*

Both Assistant Superintendents Clifford Jennings and Liberty Cash, Jr., undertook employment at Parchman in 1972. Like all of the instant defendants, Cash and Jennings do not contend that they were unfamiliar with the *Gates* order. They too concede familiarity with the *Gates* order and the duty placed upon them as a matter of clearly established constitutional law to ensure that the files of the trusty shooters were adequately screened. *See* Record, vol. III at 93–96. Furthermore, the record reveals that the assistant superintendents worked under the direct supervision of the superintendent and board members and were actively involved, as were all defendants, on a daily basis with implementation of the *Gates* decree.

Superintendent Hollowell testified that Cash and Jennings were under his express direction to undertake a review of the trusty shooters files and had authority to approve an inmate's classification or to release a prisoner from a particular classification. *See* Record, vol. II at 46–48. Indeed, Cash was a member of the classification committee responsible for classifying inmates and both Cash and Jennings were actively involved in the day-to-day classification and supervision of inmates.[9] The following responses to plaintiff's counsel's questioning surrounding the assistant superintendent's participation in implementing the *Gates* order was also presented to the jury:

Q. [A]nd, of course, just as Mr. Hollowell indicated yesterday, he had

---

**9.** Cash made the following response to questioning concerning his duties as assistant superintendent:

Q. You also had the responsibility of specifically reviewing the status of the inmate trusties who served as guards, isn't that true?
A. Yes, sir. I will go along with that.
Record, vol. III at 96.

many meetings with lawyers and with the Board concerning *Gates v. Collier* and was given instructions and directives with regard to the carrying out of the mandate of *Gates v. Collier,* and I take it that you were so involved, did have meetings with the lawyers.

A. I was actively involved in it. I certainly was.

Record, vol. III at 94–95. The record reveals that Jennings also was involved with the Board's implementation of the *Gates* order and possessed many of the same responsibilities placed upon Assistant Superintendent Cash.

Reasonably minded jurors could have concluded that the assistant superintendents failed, in their daily implementation of the *Gates* order, to adequately screen Reed's file. Although the assistant superintendents were involved on a daily basis with implementing the *Gates* order, they too are unable to specify the date on which a review of the files began, the files that were reviewed, or any of the guidelines used in their alleged screening of the inmates' files. Additionally, as we have seen with regard to Superintendent Hollowell, the assistant superintendents' failure to adequately screen Reed's file could have led the jury to the conclusion that such failure proximately caused Jackson's injuries. Reed's file is strikingly indicative of the reasons leading this Court to condemn Parchman's use of trusty shooters. Accordingly, we refuse to disturb the jury's findings of liability with regard to the assistant superintendents.

### 3. *Board Members*

■ Our inquiry into the liability of the members of the Mississippi Penitentiary Board warrants detailed consideration. Composed of five members appointed by the Governor of Mississippi with the consent of the Senate, the Mississippi Penitentiary Board appoints the superintendent and supervises the superintendent in his duty to "prescribe reasonable rules and regulations governing the humane treatment, training and discipline of prisoners, and to

make provisions for the separation and classification of prisoners ...." 1964 Miss. Laws ch. 378, § 12. Normally, in a case involving the day-to-day operations of Parchman, a jury perhaps would refuse to find liability on the part of the board members for the isolated unconstitutional actions of an inmate, since the Board generally acts in a supervisory fashion under state law. *See Bogard v. Cook,* 586 F.2d 399 (5th Cir.1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). Certainly, the board members may not be held liable under a theory of *respondeat superior. See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). However, as noted in *Jackson I,* "Jackson alleges that the individual board members had assumed responsibility over various departments at Parchman in order to relieve acting Superintendent Hollowell of some of his administrative burden." *Jackson I,* 644 F.2d at 1144.

■ Having thoroughly reviewed the record, we conclude that Jackson did present sufficient evidence to justify the jury's possible conclusion that the board members had undertaken detailed involvement in the day-to-day implementation of the *Gates* order and had become involved in activities at Parchman normally delegated to the officials they supervise. The record further contains sufficient evidence to uphold the jury's conclusion that the board members failed adequately to perform their assumed duties and that such failure was a proximate cause of Jackson's injuries. We emphasize, however, that we do not hold the board members liable under a theory of *respondeat superior* for the unconstitutional actions of those under their supervisory control. To the contrary, we simply hold each board member liable for the results of his own personal actions and inactions in the day-to-day implementation of the *Gates* order. *See Sims v. Adams,* 537 F.2d 829 (5th Cir.1976).

The previous history of litigation surrounding Parchman must temper our inquiry into the duty of each board member. Generally unwilling to meddle in the day-to-day affairs of state prison administra-

tion, we have seen that the federal courts in this Circuit have been forced to become involved in the administration of Parchman to remedy long-standing unconstitutional conditions first uncovered in *Gates*. Having reviewed the record of "gross constitutional violations" in *Gates*, this Court concluded that "the prompt and peremptory response of the district court to these issues was totally justified and was within its broad discretion and power to fashion equitable remedies." *Gates*, 501 F.2d at 1321, 1322. Of course, one of the equitable remedies imposed by the district court and approved by this Court, required the defendants, including the then-active members of the Board, to ensure that the trusty shooters were adequately screened. This, as we have seen, therefore became clearly established constitutional law.

The board members' conduct amply demonstrates that they were aware of their duties under this clearly established constitutional law.[10] Once again, we note that all of the defendants concede detailed and intimate familiarity with the *Gates* decision. It would have ignored reality for the jury to have accepted the board members' contention that their only duty under the *Gates* decree was to order the superintendent to implement the screening process, especially in view of the board members' detailed involvement in the day-to-day implementation of the *Gates* order at Parchman—activities normally delegated to the officials they supervise. Superintendent Hollowell testified that he discussed the *Gates* order and its implementation with the board members on a daily basis. *See* Record, vol. II at 46. The board members met daily for as long as eight to twelve hours at Parchman, attempting to implement the *Gates* order. The record clearly reveals that the board members were intimately involved in the day-to-day interpretation and implementation of the *Gates* order. Having joined in the effort and responsibility to implement a careful and adequate review of the trusty shooters' files, the board members cannot now be heard to claim that their only responsibility was to see that someone else implemented the review. Having undertaken the effort and duty themselves, the board members must be held to the standard of care set forth in the *Gates* order and presented to the jury through the trial court's able instructions.

In summary, we refuse to disturb the jury's findings of liability on the part of the individual board members. The evidence established that each Board member knew of his duties under clearly established constitutional law, was involved in the day-to-day implementation of the *Gates* order, but failed to ensure that the trusty shooters were adequately screened pursuant to objective criteria. Indeed, the record reveals that little was done by any of the defendants to ensure through established procedures that the trusty shooters were adequately screened. This record evidence stands in stark contrast to the broad immediate and intermediate remedial relief ordered by the district court in an attempt to

---

**10.** Moreover, as noted earlier, the board members' claim that they are not bound by the *Gates* order was resolved against them in this Court's prior decision in *Gates*. *See* note 8, *supra*. Although none of the instant board members, except one, were the same as those named defendants in *Gates*, the *Gates* order certainly placed clearly established constitutional requirements on the offices they now hold. To allow the avoidance of the express provisions of the *Gates* order by the State of Mississippi's mere substitution of board members would unduly frustrate the provisions of 42 U.S.C. § 1983. An individual assuming a government office should not be allowed to avoid the requirements of clearly established constitutional law by simply claiming that he was not a party to the litigation that established the constitutional guarantee. As the Supreme Court stated in *Harlow v. Fitzgerald*: "[A] reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 102 S.Ct. at 2739. This is not to say that a government official is liable for the unconstitutional actions of his predecessor. However, when the conduct of a government official's predecessor has been declared invalid as a matter of clearly established constitutional law, the successor government official must conform his conduct to the established constitutional norm. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id.*

alleviate the shocking conditions already found and clearly demonstrated at Parchman. (*Gates* and *Jackson I.*) We cannot conclude that the jury was without reasonable basis when it concluded that the defendants had failed to undertake adequate preventive measures to avoid the effects of the use of trusty shooters.

### C. *The District Court's Evidentiary Rulings*

■ Finally, defendants-appellants contend that the trial court committed reversible error by allowing certain fact findings that were made in *Gates* to be read to the jury. However, an examination of the district court's actions demonstrates the limited context in which the *Gates* findings were presented. The trial court instructed the jury that the *Gates* findings were being presented only as background information regarding the existence of the armed trusty system at Parchman. *See* Record, vol. III at 140–42. As the trial court noted, the information was presented only in an attempt to allow the jury to understand why the *Gates* Court had ordered screening of the trusty shooters. *Id.* As we have seen, the jury, in reaching its verdict, was required to determine whether the defendants had complied with the clearly established constitutional norm set forth in the *Gates* order. We conclude that the trial court did not err by permitting the limited presentation to the jury of some of the *Gates* findings, since the jury was entitled to understand and appreciate the development of the clearly established constitutional law they were required to apply. The relevancy of this background material was by no means outweighed by the potential prejudicial effect it may have had upon the defendants. Moreover, in light of the district court's effective limiting instructions to the jury, we hold that any error in its submission was harmless. The trial court specifically instructed the jury that the evidence "is being given to you without influencing you at all on what are the merits in Arthur Jackson's case . . . ." *Id.* at 142.

### III. *Conclusion*

Cognizant of the fact that "judges are neither correctional officers nor penologists," this Court consistently has refused to meddle needlessly in the administration of a state penitentiary. *Jones v. Diamond,* 636 F.2d 1364 (5th Cir.1981) (*en banc*). Our hesitance to interfere in prison administration stems from a recognition that "courts are ill-equipped to deal with the increasingly urgent problems of prison administration." *See Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). This recognition, however, does not require us to turn our backs on prisoners' claims alleging serious constitutional violations, for a prisoner does not enter a prison gate destitute of all constitutional rights. As the Supreme Court has noted, "In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald,* 102 S.Ct. at 2736. Such a situation has been presented to this Court.

On October 20, 1972, a federal district court ordered prison officials at Parchman immediately to begin the rapid dismantling of their system of trusty shooters. As we have seen, this system had a history replete with "intolerable patterns of physical mistreatment." *See Gates,* 349 F.Supp. at 889. Understandably, the district court's order was as broad and pervasive as the egregious unconstitutional conditions then existing at Parchman. Although the trusty shooter system was condemned under the long-term provisions of the district court's order, the prison officials were granted the privilege of continuing to utilize the system on an interim basis, only if they insured through adequate, objective screening that inmates were protected from cruel and unusual punishment at the hands of inadequately screened trusty shooters. Yet, on February 6, 1973, inmate Arthur Jackson lost his left eye as a result of a shotgun blast fired by an armed trusty shooter. An impartial jury heard ample evidence to conclude that there was virtually no adequate, objective screening whatsoever, and, in fact, concluded that the defendants in this case proximately

caused Jackson's loss of his eye as a result of their failure adequately to exercise the duties imposed upon them by clearly established constitutional law. The defendants concede familiarity with this constitutional guarantee and our review of the record reveals that the jury's verdict is amply supported by the evidence adduced at trial. Accordingly, the district court's judgment is affirmed.

AFFIRMED.