**Robert N. CREAMER,
Plaintiff-Appellant,
Cross-Appellee,**

v.

**Officer Lewis PORTER, Officer J.L. Sampson and Officer R. Johnson, Defendants-Appellees, Cross-Appellants,**

**Deputy David Austin, et al.,
Defendants-Appellees.**

No. 84–4145.

United States Court of Appeals,
Fifth Circuit.

March 15, 1985.

Garwood, Circuit Judge, dissented in part and filed opinion.

Wellborn Jack, Jr., Rebecca L. Hudsmith, Shreveport, La., for plaintiff-appellant, cross-appellee.

Cook, Yancey, King & Galloway, Edwin L. Blewer, Jr., Charles B. Peatross, City Atty., L. Edwin Greer, Shreveport, La., for defendants-appellees.

Before BROWN, WILLIAMS and GAR-WOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

This is a § 1983 civil rights action in which plaintiff recovered damages against police officers. The officers, pursuant to a search warrant authorizing the seizure of two stolen television sets, continued searching the plaintiff's business premises and residence for nearly three hours after the two televisions had been seized. Compensatory damages were assessed jointly and severally against three officers, punitive damages were assessed against the officer who supervised the search. Two other defendants, deputies from the parish where the search was being conducted and whose presence at the search was required for jurisdictional purposes, were dismissed. Plaintiff appeals on the issue of punitive damages and the dismissal of two defendants, and the other defendants cross-appeal. We reverse as to the dismissal of Deputy Bruce, and hold him liable jointly and severally with the other officers against whom actual damages have been assessed. In all other respects, we affirm.

I.

Appellant Robert Creamer owns and operates Creamer's Used Furniture and Equipment Company, a business establishment which engages in the sale of used merchandise, including appliances, furniture, tools, and television sets. Creamer purchases his merchandise from individuals as well as from other merchants. Creamer's Used Furniture is one of the three structures located on Creamer's premises. The store faces the highway. Behind the store is a shed in which merchandise is stored. Behind the shed is a two-story duplex, occupied in the upstairs apartment by Mr. Creamer and his wife and in the downstairs apartment by his sister, Virginia Dale, and her children.

On January 28, 1983, Henry Johnson, a resident of Shreveport, was walking past Creamer's Used Furniture when he noticed in the front window a television set that had been stolen from his residence several months earlier. He entered the shop and located a second television set that had also been taken during the November burglary of his home. Johnson contacted the police, and Officer Porter of the Shreveport Police Department procured a search warrant to authorize the seizure of the two television sets. On January 29, a valid warrant was issued to Porter authorizing the search of "premises located at Creamer's Used Furniture and Equipment Company on Blanchard Road, Blanchard, Caddo Parish, Louisiana, and any adjoining buildings" for the two television sets. The warrant described the sets by size, color and serial number. No other property was listed on the warrant.

At approximately 5:30 p.m. that same day Mr. Creamer left his residence for Hewitt, Texas where he was driving to pick up his wife who had been visiting there. Before leaving, he locked his apartment, the entrance to his business, and the gate of the fence surrounding the premises, and released two watch dogs in the area. Between 6:00 and 6:30 p.m., Officer Porter arrived at Creamer's with Officer Sampson. Because Creamer's establishment was outside the city limits of Shreveport and the jurisdiction of the Shreveport Police Department, arrangements had been made for two deputies from the Caddo Parish Sheriff Department to be present for the search. Deputies Bruce and Austin joined the waiting Shreveport officers to commence the search. Porter then radioed police headquarters to place a telephone call to the Creamer residence. Creamer's sister, Ms. Dale, answered the call and was told that the police were there to search the premises pursuant to a search warrant. She came down to the front gate where she was instructed by Officer Porter to "take care of the dogs before I do". After Ms. Dale had secured the dogs, Porter instructed her to let them onto the premises because

"they were going to get in one way or another". Ms. Dale unlocked the store and the officers entered.

After the entry to the store, the first television set was seized immediately from the display window. Officer Sampson located and seized the second set ten or fifteen minutes later on a workbench in the back of the store. The sets were placed on a counter in the front of the store, but the officers continued to search the premises. Officer Porter questioned Ms. Dale about several items that were listed as stolen on the report of Henry Johnson's residence. When they had completely searched through the store, Porter ordered Ms. Dale to unlock the glass door leading to Mr. Creamer's office located within the store area.[1] Once inside the office area, Officers Porter and Sampson opened file drawers, and Creamer's personal safe and desk. Four weapons, some power tools and tool boxes, and the safe were seized from the office. At this point, Officer Porter placed a call to his supervisor to request additional help in conducting the search. Officer Johnson was dispatched to the scene, and the search continued.[2] Ms. Dale placed a call to Hewitt, and left a message for Creamer to call her as soon as he reached his destination.

Creamer eventually returned the call and spoke to Officer Porter. Porter did not reveal to Creamer the purpose of the warrant, i.e., that it had been issued for the limited purpose of searching for two television sets, but rather conveyed to Creamer that he had a valid warrant to search his house and that that was what he intended to do. After the call, Creamer left immediately to return home, arriving at approximately four in the morning.

At some point during the search of the store area, Deputy Austin left to answer another call. The remaining three officers and Deputy Bruce completed the search of the store and office and then entered Creamer's apartment. The Shreveport officers thoroughly searched the apartment, while Deputy Bruce recorded serial numbers from seventeen guns that were seized in the apartment. Finally, the officers entered Ms. Dale's apartment and demanded to see receipts for certain items, which she was able to produce. At approximately 10:00 p.m., after nearly three and one-half hours of searching the premises, the officers ended their search, and removed from the premises twenty-nine items. The search had continued for almost three hours after they had seized the two television sets, the only items described in the warrant.

All of the twenty-nine items removed from the premises were kept by the police for nearly three weeks. On February 18, Creamer and his attorney went to the police station and were given all of the property back except for the two television sets described in the warrant, and a power tool which had been checked out as a stolen item. Porter at that time explained to Creamer that he had wanted to keep the weapons in police possession in order to run serial numbers through a computer to determine if they had been stolen.

Creamer brought a civil rights suit for damages under 42 U.S.C. § 1983, seeking compensatory and punitive damages against the three officers of the Shreveport Police Department and the two deputies of the Caddo Parish Sheriff's Department who conducted the search.[3] Plaintiff alleged that the search conducted by defendants had been unlawful and unreasonable, in violation of his Fourth Amendment rights. After a nonjury trial, the court delivered oral findings of fact and conclu-

---

1. Ms. Dale testified that Porter told her repeatedly that whoever was in the premises was going to be "locked up" and that if Creamer were present he would definitely be "locked up".

2. Porter testified that in this conversation with his supervisor, he was told that it was permissible for him to continue the search after having found the only two items described on the war-

rant. The supervisor was never called as a witness to confirm this, nor was any explanation given for not having done so.

3. The City of Shreveport and the Caddo Parish Sheriff's Office were named as defendants in the complaint, but were dismissed prior to trial.

sions of law. Creamer was awarded compensatory damages in the amount of $6,000 against Officers Porter, Sampson, and Johnson, the three Shreveport defendants. Plaintiff was also awarded punitive damages against Porter in the amount of $1,000. Claims against the two Caddo Parish deputies, Austin and Bruce, were dismissed.

Plaintiff now appeals from the portion of the judgment dismissing his claims against Deputies Austin and Bruce, and the portion of the judgment limiting punitive damages against Officer Porter to $1,000 and denying them against Sampson and Johnson. Officer Porter cross-appealed on grounds that the award of punitive damages against him was inappropriate, and Officers Porter, Sampson, and Johnson appealed the district court's denial of their qualified immunity defense.

## II.

■ We first consider the district court's dismissal of Deputies Bruce and Austin. The court characterized them as "really no more than bystanders who had little active participation in the search ... they were hardly more than a jurisdictional formality". We agree with this conclusion insofar as Deputy Austin is concerned. Deputy Austin was dispatched to Creamer's Used Furniture by the Caddo Parish Sheriff's Office and arrived shortly before the search of the premises commenced. Austin remained on the premises for a short time and participated to the extent of recording the serial numbers from a few appliances in the back of the store area. He left to answer another call, and returned only after the entire search had been completed. When he returned to the premises the items seized were being loaded into the paddy wagon. Austin at no time entered any area other than the business premises where the two television sets were found. He did not personally seize any items, and did not participate in the removal of items

from the premises. Given his limited participation and knowledge as to the extent of the search during his absence, we agree with the district court that he was really only a "bystander". The dismissal of the claims against him was proper.

■ As for Deputy Bruce, however, his participation in the search was far more extensive. When Deputy Bruce arrived at Creamer's store, Officers Porter and Sampson were waiting for him to commence the search because the Shreveport investigators were unauthorized to execute the warrant until he arrived. Contrary to Deputy Austin, Bruce remained with the Shreveport officers throughout the investigation. Deputy Bruce testified that he was just "walking around" while the Shreveport officers conducted the search, and that he was not personally involved. Yet he admitted having seized a power tool, one of the items removed from the premises. Bruce claims that he was not aware when the second television set was found and thought that Creamer's office and apartment were being searched in a continued effort to locate the television sets.[4] Yet he witnessed the rummaging of drawers and filing cabinets where a television set could not have been located. Bruce accompanied the three Shreveport officers to Mr. Creamer's apartment and remained throughout their search there. He recorded serial numbers from guns found in the apartment that were eventually seized. Deputy Bruce was present until the search was completed and the seized items were removed from the premises.

Given this participation in the search, we hold that the finding of the district court that Deputy Bruce was a mere "bystander" is clearly erroneous. Fed.R.Civ.P. 52(a); *Williamson v. Brown*, 646 F.2d 196, 200 (5th Cir.1981). He had read the warrant and was familiar with its limited scope. Bruce personally seized at least one item, recorded serial numbers from other items that were seized, and remained with the

---

**4.** This statement is dubious given the fact that Ms. Dale was aware when the second television set was found and knew that the two sets were brought up to the front of the store and placed on the front counter where they were clearly visible.

Shreveport investigators throughout the search, including the search of Creamer's apartment. In addition to his own participation in the search, Bruce failed to act in accordance with his jurisdictional responsibility. As a deputy of the Caddo Parish Sheriff's Office, his presence on the premises validated the search and seizure of property. Yet in the capacity as the only member of the search with jurisdiction over the premises being searched and over the property being seized, he never once questioned the Shreveport officers flagrant disregard for Creamer's privacy. Indeed, excusing him as a "jurisdictional formality" undermined the very purpose of requiring his presence during the search. Although Deputy Bruce did not participate as actively as the three Shreveport officers, he was certainly more than a mere "bystander," and should have been more than a "jurisdictional formality."

### III.

■ We next consider the police officers' defense that they are entitled to a qualified immunity for their actions. A qualified immunity is only available to those government officials who affirmatively assert the defense and who prove that they were acting within the scope of their discretionary authority. *Williams v. Treen*, 671 F.2d 892, 896 (5th Cir.1982); *Jackson v. State of Mississippi*, 644 F.2d 1142, 1145 (5th Cir. 1981). Although the defense was properly pleaded in this case, the court concluded that the extensive search of Creamer's business premises and apartment greatly exceeded the officers' discretionary scope of authority. We agree.

■ Government officials performing discretionary functions will not be shielded from liability for civil damages where their

conduct clearly violates established statutory or constitutional rights of which a reasonable person would have knowledge. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). With this pronouncement of the test for qualified immunity, the Supreme Court redefined the standard by which § 1983 defendants' conduct would be measured to determine whether the defense was available to them. The defense of qualified immunity is no longer to be evaluated with reference to any subjective consideration of an officer's good faith in carrying out certain discretionary functions. *See Kenyatta v. Moore*, 744 F.2d 1179 (5th Cir.1984); *Jackson v. Hollowell*, 714 F.2d 1372 (5th Cir.1983).[5] Balancing the interests of § 1983 plaintiffs with the public interest in shielding government from litigation on insubstantial claims against it, the Court concluded that an individual's civil rights could be vindicated adequately by using an objective standard to determine the availability of the qualified immunity defense. This approach avoids litigation of questions of fact that the subjective standard inevitably entailed.

■ The *Harlow* test requires us to make two inquiries in determining the status of a defendant's qualified immunity defense. First, the official's conduct must have violated a constitutional right that was clearly established at the time the alleged violation occurred. Second, because an official will be held to the standard of a reasonably competent public official who should know the law governing his conduct, we must determine if a reasonably competent police officer would have known under the circumstances of this case that his conduct was violative of plaintiff's constitutional rights. *See Harlow*, 102 S.Ct. at 2739.

---

**5.** This Court held en banc in *United States v. Williams*, 622 F.2d 830, 840 (5th Cir.1980), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), that "evidence is not to be suppressed under the exclusionary rule where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized". The good faith exception adopted in

*Williams* for purposes of applying the exclusionary rule embodied a subjective as well as an objective reasonableness standard. *Id.* at 841 n. 4a. However, we need not consider here any possible relationship to the exclusionary rule good faith standard in light of the Supreme Court's decision in *Harlow* which clearly establishes that only objective good faith is at issue in the qualified immunity defense.

The Fourth Amendment declares the right to be secured against unreasonable searches. General searches are clearly prohibited by the very language of the amendment:

> [N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Courts have frequently considered the question of the constitutional threshold of the Fourth Amendment's particularity requirement, especially in the context of criminal prosecutions where defendants have sought to exclude evidence that allegedly did not fall within the scope of property described in a search warrant. Few cases have dealt with searches that exceed the permissible scope of a warrant where items are unambiguously identified because the Fourth Amendment clearly proscribes such excesses.

■ Although as a general rule only items described in a search warrant may be seized, there are two relevant exceptions to this rule. First, items of "incriminatory character" found in the course of a legal search but that were not described in the search warrant may properly be seized. *Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir.1983). Second, property that has a sufficient nexus to the crime being investigated may be seized at the time officers are properly executing a warrant authorizing a search for other items. *Garland,* 717 F.2d at 206; *United States v. Kane,* 450 F.2d 77 (5th Cir.1971), *cert. denied,* 405 U.S. 934, 92 S.Ct. 954, 30 L.Ed.2d 810 (1972).[6]

■ Here, the extended search and seizure of objects at random falls far short of being justified under either exception. The nature of a used merchandise business is such that the establishment is a possible repository for some stolen items. The dis-

trict court characterized this reality as "an unavoidable occupational hazard". But this does not mean that every item is automatically endowed with "incriminatory character". Furthermore, none of the other items seized had any connection with the television sets that were listed in the warrant. Outside of the scope of the two narrow exceptions articulated in *Garland,* any search beyond the items specified in the warrant was clearly unreasonable. No exception authorizes the continued search of the premises under these circumstances after the items listed in the warrant had been seized.

In *Weeks v. United States,* 232 U.S. 383, 391–92, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the Supreme Court emphasized not only the right to be free from unreasonable searches, but also the right to be vindicated when constitutional rights are violated:

> The effect of the 4th Amendment is to put the courts of the United States and federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all intrusted under our Federal system with the enforcement of the laws.

A general, exploratory search through personal belongings is the precise evil sought to be eliminated by the Fourth Amendment's requirement that things to be seized and places to be searched be described with particularity. Standing alone, the clear language of the Fourth Amendment imparts this message. Under no circumstances could the officers justify their intrusion

---

6. In *Garland,* this Court held that the defendant had not been denied effective assistance of counsel for counsel's failure to move for suppression of certain evidence not described in the warrant because the evidence would not have been excluded, and any alleged error therefore was not prejudicial. The search warrant had

been obtained to search the defendant's automobile for "a small caliber handgun, bluish green clothing and bloody clothing." The Court held that the seizure of vacuum sweepings from inside the car and soil samples from underneath the car was permissible under the narrow exceptions discussed above.

into an area such as a desk drawer, a filing cabinet or a nightstand to search for a television set. There was no conceivable justification for the officers to continue the search after the items described in the warrant had been seized. Absolutely no regard was shown for Mr. Creamer's privacy.

In addition to finding a violation of a clearly established right, the district court found that a reasonable officer would have known that the search conducted was in violation of the clear command of the Fourth Amendment. The officers testified that it was their understanding of the law that if they were validly on the premises, they could seize anything. Again, the test in *Harlow* for qualified immunity now excludes consideration of the officers' subjective understanding of the law. We agree with the district court that this gross misstatement and simplification of the law of search and seizure cannot possibly represent a reasonable police officer's understanding of search and seizure law. All of the officers had several years of experience on the police force, ranging from six to sixteen years. All had attended classes where the law on search and seizure had been presented to them. The law regarding the permissible scope of a search where items in a warrant have been particularly described is hardly an uncertain and evolving area of law.

A search warrant describing particular items to be seized cannot be used as an admission ticket to a general search of the premises. If this were possible, the particularity requirement of the Fourth Amendment would have little import. A reasonable officer would be aware that there were exceptions to the rule confining the search to items particularly described in the warrant. But we cannot accept under an objective test that any police officer's reasonable understanding of the law would be that any item located anywhere on the premises was fair game, or that a search could continue once items described in the warrant had been seized.

## IV.

As for the punitive damages awarded, the appellant argues that the award of only $1,000 against Officer Porter, and the failure to award any punitive damages against Officers Sampson and Johnson was in error. Officer Porter contends that the award of any exemplary damages against him was improper because his actions were not so egregious as to warrant such an award. At most, he contends, his actions were negligent but not in callous disregard of Creamer's constitutional rights.

■ The award of punitive damages is consistent with the purpose of § 1983 where such an award will act to deter future egregious conduct in violation of constitutional rights. *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 1628, 75 L.Ed.2d 632 (1983); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). In *Smith*, the Court clarified the standard for awarding punitive damages, holding that such damages could be assessed when the defendant's conduct involved reckless or callous indifference to the federally protected rights of others.[7] *Id.* 103 S.Ct. at 1640.

■ The award of punitive damages is a harsh remedy and normally is not favored by law. *Lee v. Southern Home Sites Corp.*, 429 F.2d 290, 294 (5th Cir. 1970). It is for this reason that a defendant's conduct must have been in reckless disregard for the rights of others, and not just merely negligent, before exemplary damages will be assessed. The award "involves an evaluation of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent" to future illegal conduct. *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir.1977) (citing *Lee*, 429 F.2d at 294). The object of the remedy therefore is to punish as well as to deter the commission of similar offenses in the future. *Ratner v. Sioux Nat-*

---

7. Punitive damages may also be awarded when a defendant's conduct is shown to be motivated by evil motive or intent, but there is no allegation of evil motive or intent in this case.

*ural Gas Corp.*, 719 F.2d 801 (5th Cir. 1983).

■ The district court had ample reason to find that the conduct of Officer Porter constituted reckless disregard for Creamer's right to be free from unreasonable search in the privacy of his home. Whatever justification he may have offered, we believe that his remarkable three and one-half hour raiding of Creamer's personal property, his ordering a search of drawers and files when only a television set was specified in the warrant, and his flagrant disregard for the fact that the items in the warrant had already been seized demonstrated callous disregard for Creamer's constitutional rights. Even if the television sets had not been found prior to entering Creamer's apartment, there was simply no justification for rummaging through drawers and private areas where no television set could have been found. We have no difficulty concluding that the district court in its discretion properly awarded punitive damages under these circumstances. Furthermore, we agree with the district court that Porter's conduct was "not only constitutionally infirm, it was somewhat morally deplorable".

■ As for Officers Sampson and Johnson, the court did not find that their conduct arose to the same level of recklessness and, therefore, did not assess punitive damages against them. These officers obviously cannot be excused for their role of following the lead of Officer Porter and are properly made liable for compensatory damages awarded to Creamer. The award of punitive damages, however, is within the discretion of the trier of fact. *Longoria v. Wilson*, 730 F.2d 300 (5th Cir.1984); *Lee*, 429 F.2d at 294. The court here as trier of fact had sufficient evidence before it to conclude that Porter's conduct constituted reckless disregard for Creamer's rights, but that the conduct of the other Shreveport officers who were under Officer Porter's command, while negligent, did not rise to the same level of callous disregard.

■ As for the amount of punitive damages awarded against Officer Porter, we likewise defer to the district court which had the benefit of hearing the live testimony of the witnesses and was in the best position to assess what amount was proper. The court stated that the $1,000 awarded "was not a great sum of money but it may persuade others in his [Porter's] position, to make certain of their legal rights before they abrade a citizen's equally valuable legal rights". In assessing the amount of punitive damages, we must bear in mind the punitive and deterrent purposes of such an award. We believe that the court was sufficiently mindful of this purpose in determining the amount of punitive damages assessed against Porter.

We reverse as to the dismissal of Deputy Bruce, and render judgment of liability against him jointly and severally with Officers Porter, Sampson, and Johnson. In all other respects we affirm the district court.

AFFIRMED IN PART AND REVERSED AND RENDERED IN PART.

GARWOOD, Circuit Judge, dissenting in part.

I concur in all of the Court's opinion except that part sustaining the award of punitive damages against Officer Porter.

As the majority recognizes, there was no claim or finding that Porter's conduct was actuated by or involved any evil motive or intent. Similarly, there is no finding that Porter was not in fact operating under the actual, affirmative belief that his conduct was lawful. Porter testified in this connection:

"Q In conducting this search as you did, searching for items after you had located two tv sets, okay?

"A Yes, sir.

"Q Were you aware of any restriction that said you were not to do that?

"A No, sir.

"Q On January 29, 1982, were you aware of limitation on your search and seizure beyond the two items in the search warrant?

"A    No, sir, not with the search warrant. If I had found—my understanding of a search with a warrant is that if I found the items listed on the warrant, then I could in fact seize—continue with the search and seize other items that I suspected as being stolen.

"Q    This was your understanding—

"A    Yes, sir.

"Q    —of permissible law in that area?

"A    Yes, sir.

"Q    Had you operated on that assumption previously as a detective?

"A    Yes, sir.

"Q    Did you conduct this search in good faith?

"A    Yes, sir.

"Q    Did you believe you were violating any kind of constitutional rights of Mr. Creamer's that evening?

"A    No, sir.

"Q    Did you wish to harm him in any way?

"A    No, sir."

This testimony was corroborated by that of other officers. Neither the majority nor Creamer cite any substantial evidence to the contrary. The trial court made no finding otherwise, and apparently accepted Porter's explanation.   It nevertheless awarded punitive damages, because it regarded Porter's belief that he was acting lawfully as "woefully misguided," because he was "in charge," and because the invasion of Creamer's legally protected privacy was extensive. This is reflected in the following portions of the trial court's lengthy findings:

"They had, I think Detective Porter had, or Sampson had; but one or the other of them had with them the list of properties taken from Henry Johnson's house. And they were using that property list as a shopping list as they went through the items in the store and in the residence. Mr. Johnson's list included numerous items of jewelry which had prompted the officers to go from the store into the residence.

"....

"All three police officers advanced the same reason for continuing the search. Each stated that he believed that once an item in a search warrant had been found, a continuing search is then justified. Their belief, however firmly held, is, in this Judge's opinion, woefully misguided. Once items in a search warrant are found, any search occurring thereafter is, as a practical matter, a warrantless search.

"....

"It is easy to understand why those officers may have believed that they were entitled to search all of the buildings included within the fenced lot. The warrant specifically defines this place, including all buildings on the property of Mr. Creamer. But that same warrant placed another limitation on their authority. It stated their right to search extended only to find two described television sets, complete with serial numbers. Once the television sets had been found, the authority to continue the search vanished.

"....

"Under no circumstances, however, could the officers justify their intrusion into an area such as a desk drawer or a night stand; into which no television set described in the warrant could possibly have fit.

"....

"Detective Porter testified that he did not list other items that were in Henry Johnson's desk drawer in the application for a warrant because he said he believed that he had authority to search for the remaining items once the television sets were located. If Detective Porter suspected that the other items were there, he could just as easily have asked that they be described in his warrant. But he did not.

"....

"It does not require a strained interpretation of the jurisprudence to decide that a search conducted after the termination given in the warrant has expired is a warrantless search. The defense of

qualified immunity is therefore not available to the defendants in this case. A reasonable person would have known that a search conducted without the authority of a warrant is in violation of the command clearly written almost two hundred years ago in the Fourth Amendment.

" . . . .

"Punitive damages are permissable [*sic*] in a section 1983 case when the defendant or defendants show reckless or callous indifference to federally protected rights. I consider the entering of Mr. Creamer's home and the search of it; after the television sets had been found and the warrant relapsed or expired; was not only constitutionally infirm, it was somewhat morally deplorable. If the level of the police officer's training is such that they understand that once you find an item listed on a search warrant, that then you can continue and continue and enter other parts of the premises—I believe that is a matter which would commend itself to the local Police Academy and other law enforcement training personnel in this general area. The primary responsibility for the manner in which the search was conducted lies with Detective Porter. And it is readily apparent from the testimony of all the witnesses that he showed absolutely no regard for Mr. Creamer's rights to privacy. So far as Detective Porter was concerned, he had a perfect right to go upstairs, unlock that door, and go in Mr. Creamer's private residence; even after he had found the two items that he had been authorized to search for. That is an impermissable [*sic*] intrusion into a place of residence and ought to be considered such in any civil rights country. The leader of the brief investigation was Detective Porter. And the sum of $1,000 in punitive damages is set against Detective Porter."

While the opinion in *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), is not entirely explicit on the point, I believe that fairly read it stands for the proposition that a showing of either *willful misconduct* or *conscious indifference* to the rights of others is required for punitive damages to be assessed under section 1983, and that mere gross negligence is not sufficient. *See id.* 103 S.Ct. at 1633, 1637.[1] As applied to a case such as this, conscious indifference connotes a requirement that the defendant, if not actually aware that his conduct is unlawful, must at least be conscious that it may well be so and indifferent whether it is or not.

This view is likewise suggested by the comparison made in *Smith v. Wade* between the state of mind necessary for a punitive damage award in section 1983 cases and in private figure media libel cases, the latter requiring "proof of 'knowledge of falsity or reckless disregard for the truth.' *Gertz* [*v. Robert Welch, Inc.*], 418 U.S. [323], at 349, 94 S.Ct. [2997], at 3011 [41 L.Ed.2d 789] [1974]." *Smith v. Wade,* 103 S.Ct. at 1637. *Gertz* holds that although knowledge of falsity or reckless disregard for the truth need not be shown for a private figure to recover actual damages for a media libel, such a showing is required for punitive damages to be recovered, just as it is for there to be any recovery, actual or punitive, where the plaintiff is a public figure or official. *Gertz,* 94 S.Ct. at 3011, 3012. *Gertz* also points out in this connection, that although " 'actual malice' in the traditional sense of ill-will" is not required, and although knowledge of falsity is also not required if "reckless disregard of the truth" is established, nevertheless the latter necessitates a showing of "subjective awareness of probable falsity." *Id.* 94 S.Ct. at 3004 n. 6.

Here, Officer Porter in good faith believed the search he conducted was legal.

---

**1.** *See also id.* 103 S.Ct. at 1635, citing Restatement (Second) of Torts, § 908(2). Comment *b* thereto provides in pertinent part: "[P]unitive damages ... can be awarded only for conduct ... involving some element of outrage *similar* to that *usually* found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others." (Emphasis added.)

Hence he may not be said to have acted in conscious or reckless indifference to Creamer's legal rights.

I would reach the same conclusion even if the test for punitive damages did not contain any subjective element, but rather could be satisfied merely by a showing of gross negligence of the most extreme variety. While I concede that, under the operative *facts* as known to Porter and the others (except Austin), the *law* was not unsettled and their conduct was indisputably illegal, so they were not entitled to qualified immunity, in my opinion any finding of truly gross negligence on their part is wholly unsupported. There is no suggestion that this sort of problem had ever arisen with any frequency or was well known to the average police officer.[2]

It must be remembered that when the two television sets were taken from Johnson's house, other items were taken at the same time, some from Johnson's desk drawer, including numerous items of jewelry. Porter was informed of all this, had a list of the other items, and was looking for them as well as the television sets. Porter had been informed that Johnson saw the television sets in Creamer's store. This may be why only they were listed in the warrant. The warrant was doubtless recognized as necessary authority to enter the premises. But once lawfully on the premises, it seems not grossly unreasonable for a nonlawyer to think that discovery of the stolen television sets *enhanced*, rather than *diminished*, the officer's authority. Johnson's story had now been confirmed, not disparaged. One can understand how a person who does not "think like a lawyer" might conclude that once entry and presence were legitimated by the warrant, further search would be governed by a "prob-

able cause" standard, thought to be satisfied in this instance by the initial discovery of the television sets Johnson had reported as being stolen. Only after the officers confirmed the presence of one of the television sets stolen from Johnson's home were other items searched for. Of course, the officers were not searching for television sets in desk drawers and safes. But jewelry and other items were taken from the Johnson home, including items from his desk drawer, at the same time his television sets were stolen. Since the stolen television sets were at Creamer's, it was not wholly unreasonable to believe the other items stolen at the same time and place might also have been there, and might have been in a desk drawer, filing cabinet, safe, or the like.[3]

It seems to me that the district court and majority have failed to realize that what is obvious to a judge, or even to almost any lawyer, is not necessarily obvious to the average police officer, and in holding Officer Porter *amenable* to punitive damages have erred by focusing on the degree of invasion of Creamer's legal rights, a matter primarily relevant to the *amount* of punitive damages, rather than on the level of Porter's personal moral culpability. Creamer, whom the trial court found suffered no economic loss, has nevertheless recovered $6,000 in damages for feelings of humiliation, distress, and reputation damage, plus full costs and reasonable attorneys' fees in this action. Porter is justly liable for all this. But in addition, Porter has been penalized $1,000, essentially for no more than negligence in the performance of his official duties. The penalty for the same conduct could as well have been $15,000, *if* Porter's invasion of Creamer's legal rights had been willful or done with conscious indifference to what those rights

---

**2.** *Cf. United States v. Highfill,* 334 F.Supp. 700, 701 (E.D.Ark.1971):

"Somewhat surprisingly, neither counsel for the parties nor the Court has been able to find reported cases dealing specifically with the narrow point raised: whether officers executing a search warrant, after having found the very (and only) article listed in the warrant, may lawfully continue to search for, and seize, evidence of the same crime. It is the opinion of the Court that, under the facts and circumstances of this case, they may not ...."

**3.** Also, as the majority notes, the nature of Creamer's business, selling used merchandise acquired from individuals as well as from other merchants, makes it "a possible repository for some stolen items."

were. But that has not been shown. The award of *any* punitive damages is hence contrary to *Smith v. Wade.* I therefore respectfully dissent from the affirmance of that award.