# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 13, 2026

Lyle W. Cayce
Clerk

No. 25-30016

ALBERT K. ALEXANDER,

*Plaintiff—Appellant*,

*versus*

DWAYNE ARCENEAUX; JEFF HEBERT; CALVIN PARKER; KYLE P. MANCEAUX; GREG CORMIER; JARVIS MAYFIELD; JAMES CRAFT; KRISTINA BERNARD STRONG,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:11-CV-1749

Before CLEMENT, DOUGLAS, and RAMIREZ, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

Police had a warrant to search Albert Alexander's residence for firearms, but when they executed the warrant, they found pellet rifles instead. While they were searching the house, the officers noticed electronics and appliances that were either brand new in unopened boxes, wrapped in plastic, covered in pillowcases, or sitting on blankets. The officers had previously received tips that Alexander kept stolen electronics at his house, and the

officers' observations on the scene corroborated these reports. So, the officers seized the goods, suspecting that they were stolen contraband.

Alexander brought a § 1983 suit against the officers, alleging that they violated the Fourth Amendment by seizing items that were not listed in the search warrant. The district court granted summary judgment to the officers, concluding that they are entitled to qualified immunity because the seizure was justified under the "plain view" doctrine. We AFFIRM: Based on the tips the officers received, their observations on the scene, and their prior experience, the officers had probable cause to believe that the items were stolen, so they constitutionally seized them under the plain view doctrine.

I

On December 29, 2010, officers with the Lafayette Police Department responded to a call from Sharlette Alexander ("Sharlette") and her girlfriend, Dashawna Morrison ("Morrison"), about a disturbance that had taken place the day before. The women reported that they had been living with Sharlette's grandfather, Albert Alexander ("Alexander"), at 212 I-B Street in Lafayette, Louisiana, for several months. Then, after an argument on December 28, Alexander told them to leave, and he attacked them when they exited the house.

Five days after the women gave their initial report, Officer Kristina Strong conducted a follow-up interview. During this interview, Sharlette and Morrison both told Officer Strong that Alexander—who had previously been convicted of a felony—owned a firearm and kept it at 212 I-B Street. Morrison reported that the firearm was a brown shotgun and that Alexander kept it behind a china cabinet near the back door.

During this follow-up interview, Sharlette and Morrison also told Officer Strong that Alexander kept stolen items in his house. According to the women, these items included electronics and furniture, and Alexander

had bragged about stealing things without getting caught. Sharlette and Morrison both provided (undated) written lists of these purportedly stolen items.

After interviewing Sharlette and Morrison, Officer Strong learned that Officer Calvin Parker was independently investigating Alexander for threatening his son, granddaughter, and ex-girlfriend. Officer Parker informed Officer Strong that some of Alexander's family members reportedly feared he would "make good" on his threats because he had a history of violence and kept firearms at his residence. Armed with this information, along with Sharlette and Morrison's reports, Officer Strong sought a warrant for Alexander's arrest and a warrant to search his residence for firearms. On January 4, 2011, Officer Strong obtained an arrest warrant and a warrant to search 212 I-B Street for "[a]ny and all firearms, ammunition, ammunition clips, ammunition boxes, firearm storage boxes, spent projectiles, spent cartridges, firearms or ammunition paperwork."

Officers executed the search warrant that day. Alexander was not present. When the officers entered the residence, they observed that the house "was in disarray" and "looked like it was being gutted." Electronics and household appliances—including three flatscreen televisions, three DVD players, and four stereo systems—were scattered throughout the house and in plain view. Many of the items were new, unopened in their original packaging, and stacked up next to each other. Other items were wrapped in plastic, covered with pillowcases, or placed on top of blankets. In addition, the officers saw new furniture sets that were stacked against the walls and not in use. Officer Strong later testified that, based on her experience, the number of items in the house and the manner in which they were stored were "indicative of . . . how people house stolen property."

No. 25-30016

Shortly after the officers entered the residence, they found two large pellet rifles behind an armoire near the back door. Officer Strong called Morrison to ask whether these pellet rifles were the "firearms" she had reported seeing in Alexander's residence. Morrison confirmed that they were, and she explained that she did not have experience with firearms and believed the pellet rifles were "real." Officer Strong then asked Morrison about the electronics and appliances that officers observed in the residence. Morrison reaffirmed what she had told Officer Strong during their interview: "Alexander had confided in her that the items in the residence were stolen." Having confirmed Sharlette and Morrison's earlier report that Alexander kept stolen goods in the residence, the officers seized many of the electronics and appliances.[1] Although the officers also believed the furniture sets were stolen, they did not seize them. Instead, they photographed the furniture and wrote down descriptions.

The next day, officers discovered that the furniture they photographed matched the descriptions of furniture that had recently been stolen from Clayton Homes, a local mobile home dealership. Officer Strong sought and obtained a second warrant to search Alexander's residence, this time for the furniture. While executing the warrant, officers noticed a hot tub, several pallets of shingles, and a hot water heater that also matched descriptions of stolen items. The officers recorded these items' serial numbers and later confirmed that they had been reported stolen.

Thus, the following day, Officer Strong applied for and obtained a third warrant to search 212 I-B Street. While officers were executing the

---

[1] These items included electronics such as a portable DVD player, a computer with accessories, three flatscreen televisions, three DVD players, four stereo systems, a printer, and a laptop computer. Officers also seized household appliances—including a crock pot, a fryer, a rice cooker, and a vacuum cleaner—as well as a scooter.

warrant, representatives from Van Allen Homes, Home Depot, and Lowe's—the entities that had reported the items as stolen—arrived on the scene, and officers distributed the property to them.

The day after officers executed the third search warrant, they located and arrested Alexander. He was charged with six counts of possession of stolen property. Alexander was detained for over two years pending trial, which commenced in January 2014. By the time trial began, only two of the six counts remained, and the jury found Alexander not guilty on both counts. Two years after he was acquitted, the items that the officers seized during the first search were still in police evidence, so the Lafayette City-Parish Consolidated Government sold them at auction.

In September 2011, while Alexander was detained awaiting trial, he filed a pro se action under 42 U.S.C. § 1983. After a six-year stay pending the resolution of his criminal trial and a number of dismissed claims and amended complaints, Alexander obtained counsel and filed a third amended complaint in October 2021. He raised claims under the Fourth, Fifth, Eighth, and Fourteenth Amendments against James Craft, the former Chief of Police for the City of Lafayette, and seven police officers in their individual capacities. In relevant part, Alexander alleged that the officers violated the Fourth Amendment when executing the first search warrant because they conducted a general exploratory search of his residence and seized property that was not listed in the search warrant. The defendants moved for summary judgment, asserting qualified immunity as to Alexander's Fourth Amendment claim.

The district court granted summary judgment to the defendants and dismissed all of Alexander's claims with prejudice. The court determined that the officers had not violated the Fourth Amendment because the electronics and appliances they seized were in plain view and their incriminating nature was immediately apparent. Considering the tips from

No. 25-30016

Sharlette and Morrison and the fact that many of the items were brand new and stored in their original packaging, the court concluded that the officers had probable cause to seize the items under the plain view doctrine. Because Alexander did not show a violation of the Fourth Amendment, the court held that the officers were entitled to qualified immunity and dismissed Alexander's claim. Alexander timely appealed.

## II

We review a grant of summary judgment de novo. *Thompson v. Mercer*, 762 F.3d 433, 435 (5th Cir. 2014). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III

Although the district court dismissed all of Alexander's claims, he appeals only the dismissal of his Fourth Amendment claim. Alexander contends that the officers violated the Fourth Amendment during the first search of his residence by seizing items that were not listed in the search warrant, and he argues that the district court erred by concluding otherwise.[2]

---

[2] Alexander also argues that the district court erred by declining to address whether he has Fourth Amendment standing before determining that the search was constitutional under the plain view doctrine. But Fourth Amendment standing is distinct from Article III standing, "which is jurisdictional and must be assessed before reaching the merits." *Byrd v. United States*, 584 U.S. 395, 410–11 (2018). In contrast, "Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine," so it "need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Id.* at 411.

To overcome the officers' assertion of qualified immunity, Alexander must show (1) that they "violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Because we hold that Alexander has not shown a constitutional violation, we do not reach the second prong.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* It is undisputed that the first search warrant did not describe any of the items seized during the first search. But the Fourth Amendment's warrant requirement is subject "to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).

One such exception is the plain view doctrine, which "provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment." *Texas v. Brown*, 460 U.S. 730, 738 (1983) (plurality opinion); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971) (plurality opinion) ("It is well established that under certain circumstances the police may seize evidence in plain view without a warrant."). Under this doctrine, officers can seize items without a warrant if "(1) the officers lawfully entered the area where the items were located; (2) the items were in plain view; (3) the incriminating nature of the items was 'immediately apparent'; and (4) the officers had a lawful right of access to the items." *United States v. Buchanan*, 70 F.3d 818, 825 (5th Cir. 1995) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)).

Alexander focuses on the third element, arguing that it was not immediately apparent that any of the items officers seized were stolen. According to Alexander, he was renovating his house after it was damaged by a hurricane, and that is why the electronics and appliances were stored the way they were.

"The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband." *Id.* at 826 (citing *Arizona v. Hicks*, 480 U.S. 321, 326–27 (1987)). "Probable cause does not require certainty." *Id.* Rather, it "is a flexible, common-sense standard" that "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime." *Brown*, 460 U.S. at 742 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). "[I]t is not necessary that the officer know that the discovered res *is* contraband or evidence of a crime, but only that there be 'a "practical, nontechnical" probability that incriminating evidence is involved.'" *United States v. Espinoza*, 826 F.2d 317, 319 (5th Cir. 1987) (quoting *Brown*, 460 U.S. at 742–43). When "reviewing probable cause determinations, we must consider the totality of the circumstances—including the officers' training and experience as well as their knowledge of the situation at hand." *Buchanan*, 70 F.3d at 826; *see also United States v. Turner*, 839 F.3d 429, 433 (5th Cir. 2016) (reciting these standards).

Looking to the totality of the circumstances, it is undisputed that, before the search, Officer Strong received tips from Sharlette and Morrison that Alexander kept stolen items at his residence. They reported that these items included electronics such as televisions and DVD players, and they said that Alexander had bragged about stealing things without getting caught. Alexander explains that he had evicted Sharlette and Morrison, and they fabricated their reports to get back at him. But while Alexander challenges

the veracity of Sharlette and Morrison's reports, he does not dispute that officers had received these tips about stolen goods before they commenced the first search of 212 I-B Street.[3]

Moreover, it is undisputed that when the officers entered the residence, they saw a considerable number of electronics and appliances stored in the house. These items were either stored in their original, unopened packaging, wrapped in plastic, covered with pillowcases, or placed on top of blankets. Officer Strong testified that the number of items in the house and the fact that many of the items were in their original packaging reminded her of cases she had worked in which people stored and resold stolen goods. Alexander offers an alternative explanation for why the items were stored in this manner, but he does not dispute the officers' testimony about what they observed in the residence.

In sum, officers had received tips from Morrison and Sharlette that Alexander kept various stolen items, including electronics and appliances, in his residence. When the officers entered the residence, they saw many such items sitting in plain view. The items were packaged and stored in such a way that indicated to the officers, based on their experience and their knowledge of the situation at hand, that they were stolen. Officer Strong then called Morrison, who confirmed that Alexander had told her he kept stolen items in the residence. Based on these facts, a reasonable officer could have believed that there was a "'practical, nontechnical' probability" that the items in the residence were stolen property. *See Brown*, 460 U.S. at 742 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)); *see also* 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth

---

[3] Alexander does not contend that the officers relied on a false statement to obtain the search warrant. Alexander raised a claim under *Franks v. Delaware*, 438 U.S. 154 (1978), relying on similar allegations, but he abandoned this claim in the district court.

AMENDMENT § 4.11(c) (6th ed. 2021) (explaining that the plain view doctrine has justified warrantless seizures when "the quantity and placement of the articles were such that they obviously were not on the scene for ordinary use" and when officers, "after observing suspicious items . . ., while still within the premises, contact the police station and learn that items of that description were earlier reported stolen"). In other words, the incriminating character of the items was immediately apparent, so the officers were justified in seizing them under the plain view doctrine.

Alexander's arguments to the contrary are unpersuasive. He argues that the officers violated *Arizona v. Hicks* by taking additional investigative steps to establish probable cause. Specifically, he argues that Officer Strong had to call Morrison to establish probable cause to believe that the items were stolen.[4] Alexander ignores the fact that Sharlette and Morrison had reported that there were stolen items in the house *before* the search began. Given the earlier reports and the officers' observations on the scene, the officers already had probable cause to believe the items were stolen before Officer Strong called Morrison. Officer Strong's call merely confirmed what Morrison had already told her: that Alexander had bragged about keeping stolen items at 212 I-B Street.

Moreover, Alexander argues that the officers conducted an impermissible "general exploratory search" of his home that should have stopped after they confirmed the reported firearms were actually pellet rifles. Alexander relies on *Creamer v. Porter*, 754 F.2d 1311 (5th Cir. 1985), for support. In that case, officers obtained a warrant to search a used merchandise store for two stolen television sets. *Id.* at 1314. "The warrant

---

[4] Alexander also argues that the officers violated *Hicks* by checking items' serial numbers and searching databases. But the officers checked serial numbers and databases in the later searches, and Alexander challenges only the first search.

described the sets by size, color and serial number," and it listed "[n]o other property." *Id.* Although officers located and seized both television sets within fifteen minutes of entering the store, they continued to search the property for over three hours. *Id.* at 1315. The officers searched everywhere from the locked office in the back of the store to the store owner's apartment on the back of the lot, seizing a total of twenty-nine items. *Id.* at 1314–15. We held that the plain view doctrine did not justify the officers' "extended search and seizure of objects at random" because none of the items they seized (other than the televisions) bore any indicia of criminality. *Id.* at 1318. "There was no conceivable justification for the officers to continue the search after the items described in the warrant had been seized," so we concluded that they violated the Fourth Amendment by continuing the search and seizing additional items after they seized the two televisions. *Id.* at 1319.

*Creamer* is distinguishable for two reasons. First, the warrant in *Creamer* listed two specific items, and when police seized them, their search should have ended. *See id.* Here, the search warrant authorized a broader search for "[a]ny and all firearms, ammunition, ammunition clips, ammunition boxes, firearm storage boxes, spent projectiles, spent cartridges, firearms or ammunition paperwork." When the officers found the two pellet rifles, they did not satisfy the warrant's objective. Family members other than Sharlette and Morrison had reported that Alexander kept firearms in the house. Thus, after the officers seized the pellet rifles, they still had reason to believe they might find other firearms or ammunition on the property, and the warrant authorized them to search for such items.

Second, in *Creamer*, the officers' only justification for believing the items they seized were stolen was that they found them in the same used merchandise store where they recovered the stolen televisions. *See id.* at 1318. In contrast, here, the officers had received tips that Alexander possessed

stolen electronics and appliances, and when they entered the residence, they saw items that corroborated those tips. The quantity of the items and the manner in which they were stored further supported the officers' reasonable belief that the items were stolen. Given this additional context, the officers here had a stronger indication that the items were stolen than did the officers in *Creamer*, who only knew that the televisions were found in the store and their owner had reported other items as stolen. *See id.* at 1315.

Based on the totality of the circumstances, the officers had probable cause to believe that the items they seized during the first search of Alexander's residence were stolen. Because the officers were lawfully in the residence pursuant to the search warrant, the items were in plain view, the incriminating nature of the items was immediately apparent, and the officers had a lawful right to access them, their seizure was justified under the plain view doctrine. *See Buchanan*, 70 F.3d at 825.

## IV

The officers did not violate the Fourth Amendment, so they are entitled to qualified immunity on Alexander's Fourth Amendment claim. Accordingly, we AFFIRM the district court's grant of summary judgment.